THOMAS EDWARD GRAY *v.* STATE
OF MARYLAND

[No. 190, September Term, 1968.]

678

*Decided May 5, 1969.*

*Edward P. Camus,* with whom was *Regis A. Johnston* on the brief, for appellant.

*John J. Garrity, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Arthur A. Marshall, Jr., State's Attorney for Prince George's County,* and *James E. Kenkel, Deputy State's Attorney for Prince George's County,* on the brief, for appellee.

MORTON, J., delivered the opinion of the Court.

The appellant was separately indicted for the murder of his father, Thomas Isiah Gray, and his aunt, Marie Johnson. The cases were consolidated for trial in the Circuit Court for Prince George's County; the jury returned a verdict of manslaughter in each case; and five year concurrent sentences were imposed.

The appellant was sixteen years old at the time the fatal shootings occurred as an aftermath of a fight involving the appellant's mother and father as well as the mother's sister who was allegedly having an extra-marital affair with the father. The evidence indicates that the father, who worked at night, returned home on Saturday morning, November 4, 1967, at approximately 9:30 a.m. Following their customary practice on Saturdays, the father, mother, fourteen-year-old daughter, their son the appellant, and a young nephew drove to Upper Marlboro to obtain groceries. En route they picked up Marie Johnson at her home, stopped to purchase alcoholic beverages, and proceeded to the grocery store. In the course of the journey the women drank rum and coca-cola while the father sipped from a half pint of scotch whiskey.

As they were returning home, an argument ensued over certain love letters from Marie Johnson to the appellant's father

which his mother had discovered a week before. During that week, the mother had almost daily upbraided the father about his affair with Marie Johnson and on each occasion he responded by beating her up. Most of these altercations were witnessed by the appellant. The argument in the car on Saturday morning ended several miles from their home when the mother "accidentally" burned the father with a cigarette, whereupon he ordered her out of the car to walk home. Marie Johnson also alighted and began walking with the mother while the father and the children proceeded in the automobile. The two women were given a lift home by the father's sister who chanced by in her car. On the way, more drinks were consumed by the mother and Marie Johnson.

As they drove into the yard the father told the fourteen-year-old daughter, in the presence of the appellant, to tell the mother "not to come into the house or else he was going to kill her." The mother disregarded the admonition and came into the home, whereupon the father seized a large wrench, hit his wife on the side of the head and kicked her in the stomach. She was fighting him back with a smaller wrench. At this point the father's sister seized him, and the appellant seized his mother, forcibly separating them. The mother then went outside and proceeded to attack Marie Johnson who was still sitting in the car, whereupon Mrs. Johnson got out of the car, seized a piece of two inch by four inch lumber and started flailing the mother. In the meantime, the father had proceeded to get his shotgun and shells, announced he was going to kill the mother but was forcibly disarmed by his sister who wrestled the gun from him. The father then went outside and when he saw the mother and Marie Johnson fighting on the ground with the mother on top, he pulled her off and placed Marie Johnson on top and then went over and stood beside his sister.

At this point, according to the fourteen-year-old daughter, she saw her brother go into his room and return with a shotgun. "I asked him what he was going to do. He just said he is tired. But he said more than that. He said he was tired of this —he said he was tired of this mf—I am using initials—mf— s-h-i-t." The appellant then proceeded to shoot the father in the head from a distance of approximately twenty feet, resulting in

his immediate death. According to the testimony of the father's sister, just prior to being shot, the father was doing "nothing but standing up * * * beside of me * * *." The appellant then proceeded to reload the single shotgun and shoot Marie Johnson who died some hours later. The father's sister also testified with regard to Mrs. Johnson, who had been fighting with the appellant's mother just previously, that "when she went for to get up off, raise up off the ground, I saw the defendant when he shot her." Immediately thereafter, according to the witness, the appellant said: " 'I'm tired of it. I'm going to break it up, break up this fighting. I'm tired of it. I'm sick of it.' And he whirled the gun around at us who were standing in the yard * * * pointed the gun at us * * * [and] he said, 'Any of you all want it?' " After ordering the sister's fifteen-year-old son out of her car at gunpoint, the appellant entered her car and drove away from the premises. The appellant was apprehended an hour and a half later about two miles from his home, apparently en route back to the house.

The appellant's mother testified that her husband had been drinking about a pint of whiskey per day the week preceding his death; that he and the appellant had a very close relationship; that her son was in the tenth grade of public school; and was a "good boy" who had never been in trouble before. She testified that at the time of the shooting, she had held up her hand to her son and said: "No."

The appellant testified that he was lying on his bed when he "heard my mother hollering so I rushed outside, and there was mom and my father was beating her. * * * After I saw this, I figured after what he said when he first came in, I thought he was trying to carry it out, so I just ran in and got my gun and came out and just shot to stop them from killing my mother or doing any harm to her." He remembered shooting his father but asserted that he "blanked out" and remembers nothing until he was apprehended. He testified that he was aware that his father had earlier in his life killed two men on separate occasions and had rammed another man with an automobile although he was not convicted of any charges in connection with these occurrences. He stated that he was devoted to his father and

that "instead of being father and son we were like two twin brothers."

I

The appellant first contends that because of his age, the Circuit Court had no jurisdiction to try him on manslaughter charges, since there was no waiver by the juvenile court and, therefore, the verdicts of manslaughter were a nullity. He points out that the juvenile court is given original, exclusive jurisdiction concerning a delinquent child by Md. Code, Art. 26, § 53, and that a "delinquent child" is defined in § 52 as a person under the age of eighteen years, "who violates any law or ordinance, or who commits any act which, if committed by an adult, would be a crime not punishable by death or life imprisonment * * *." While the appellant concedes that the Circuit Court has exclusive jurisdiction when a delinquent child is indicted for first degree murder, since the crime is punishable by death or life imprisonment, he argues that such court has no jurisdiction over a juvenile delinquent charged with second degree murder or manslaughter, absent a waiver, as here, since such crimes are not punishable by death or life imprisonment.

On the surface the appellant's argument appears logical, persuasive, and it would appear to be supported by cases in Louisiana and New York cited in his brief. See *State v. Bedford,* (La.) 190 So. 347; *State v. West,* (La.) 139 So. 304; *People v. Murch,* (N. Y.) 189 N. E. 220. See also, *Metcalf v. Commonwealth,* (Mass.) 156 N.E.2d 649. We are of the opinion, however, that the proposition advanced by the appellant (and the rationale of the decisions he relies upon) overlooks the fundamental principle of law that once a court lawfully acquires jurisdiction over the person and the subject matter of the litigation, subsequent events will not ordinarily deprive the court of its jurisdiction, although had they existed at the time, they may have initially precluded the court's jurisdiction. The rule was well articulated in *Collins v. Robbins,* (Me.) 84 A. 2d 536, where it was stated (at p. 538) :

> of law that 'the jurisdiction of a court depends upon the state of affairs existing at the time it is invoked, "It has long been accepted as a well known principle

> and if the jurisdiction once attaches to the person and subject matter of the litigation, the subsequent happening of events, though they are of such a character as would have prevented jurisdiction from attaching in the first instance, will not operate to oust the jurisdiction already attached. * * * 12 *Encyclopedia of Pleading and Practice,* page 171."

In that case a child under the age of seventeen years was indicted for murder and permitted to plead guilty to the lesser included offense of manslaughter. The question presented was whether the lower court had jurisdiction to impose sentence on a guilty plea of manslaughter in view of a statute which conferred upon juvenile courts "exclusive original jurisdiction over all offenses, except for a crime the punishment for which may be imprisonment for life * * * committed by children under the age of seventeen years * * *." It was held that since the lower court lawfully acquired jurisdiction over the child by virtue of the charge of murder it did not lose jurisdiction by accepting a plea to manslaughter even though initially it would not have had jurisdiction over the lesser offense of manslaughter.

In *Howland v. State,* (Tenn.) 268 S. W. 115, it was held that notwithstanding a statute conferring jurisdiction upon juvenile courts of all crimes committed by a child under sixteen years of age, except rape and murder, the trial court did not lose jurisdiction over a child indicted for murder where the jury brought in a verdict of manslaughter. The court said (at p. 116) :

> "But where the Grand Jury presented an indictment for murder against one under sixteen years of age, as was done in this case, the jurisdiction of the criminal court over the offense of murder being exclusive, that court would not thereafter lose its jurisdiction by a verdict assessing a degree of homicide below murder. 16 C. J. 181, pars. 246, 247."

To the same effect is *State v. Skeen,* (W. Va.) 75 S.E.2d 223, (cert. denied, *Hinkel v. Skeen,* 345 U. S. 967) where it was held that a state circuit court, having acquired jurisdic-

tion of a capital offense by virtue of an indictment charging a juvenile with murder, did not lose jurisdiction of the person or the offense by accepting a plea of guilty to the non-capital crime of murder in the second degree, notwithstanding a State statute giving exclusive jurisdiction to juvenile courts in those cases involving juveniles charged with non-capital offenses. See also *Hinkel v. Skeen,* 117 F. Supp. 846.

Likewise in *Reynolds v. Commonwealth,* (Va.) 27 S. E. 427, it was held that a court having jurisdiction of an indictment is not ousted thereof by a conviction of a misdemeanor included in a felony, although it had no original jurisdiction of such misdemeanor.

Also, see Annotation, 48 A.L.R.2d 663, ("Homicide by juvenile as within jurisdiction of a juvenile court").

We agree with the rationale of these decisions. We believe that the Legislature, in excluding from the jurisdiction of juvenile courts, juveniles charged with crimes punishable by death or life imprisonment, did not intend to oust the trial courts of jurisdiction in cases where a verdict of guilty or a plea of guilty to a lesser included offense not punishable by death or life imprisonment is entered. In the case at bar, the indictment was in the statutory form authorized by Md. Code, Art. 27, § 616. Under this form of indictment any one of five verdicts could be found: (1) murder in the first degree (punishable in the discretion of the judge, by death or life imprisonment, Md. Code, Art. 27, § 413) ; (2) murder in the first degree without capital punishment (life imprisonment, Md. Code, Art. 27, § 413) ; (3) murder in the second degree (not more than thirty years, Md. Code, Art. 27, § 414) ; (4) manslaughter (not more than ten years, Md. Code, Art. 27, § 387) ; (5) not guilty. *Wood v. State,* 191 Md. 658; *McFadden v. State,* 1 Md. App. 511. The Circuit Court clearly had original, exclusive jurisdiction over the appellant on the capital charge which was contained in the indictment and we do not believe that the Legislature intended, after a full trial on the capital charge, to have such proceedings declared to be a nullity where a verdict of second degree murder or manslaughter is returned. We hold that in view of the statutory form of indictment here employed, under which the lower court lawfully acquired jurisdiction of the appellant

on a capital offense, it did not lose jurisdiction over the appellant, in this instance, by the jury's return of a verdict of manslaughter which was a lesser offense included in the statutory form of indictment. Accordingly, we find no merit in the appellant's contention that the lower court was without jurisdiction to enter the judgments of manslaughter.

## II

The appellant next contends that the court's refusal to grant his requested instruction to the jury entitled "Acting on Appearances" was reversible error. It is argued that the appellant's defense was predicated upon the legal proposition that the killings were justified or excused because consummated in the course of defending his mother from possible death or serious bodily harm. See *Tipton v. State*, 1 Md. App. 556. The requested instruction was taken almost verbatim from the text of Clark and Marshall, *Law of Crimes*, (5th Ed.—Wingersky Rev.) pp. 430-431, and it is unnecessary for the purpose of this opinion to reproduce it here. In substance, the requested instruction provided that it is not necessary that there shall be an actual danger to entitle a person to defend himself or a close relative; a reasonable appearance of danger is enough to justify the homicide.

We have carefully examined the instructions given to the jury by the trial court and it is apparent that the requested instruction would have been merely cumulative since the court had advised the jury that "in order to justify or excuse the killing of another on the ground of self defense, it is necessary to establish that the defendant * * * believed at the time he was, or a person close to him or some close relative, was in immediate danger of losing his or her life, or suffering serious bodily harm and believed it necessary in the protection of that life of another to save that person, that the circumstances were such as to warrant reasonable grounds for such belief in a mind of ordinary reason * * *." After argument out of the presence of the jury concerning the requested instruction the jury was additionally advised as follows:

"The court would advise you that the test of self defense is not what the jury thinks a reasonable man

> would believe, but rather what the defendant, as a reasonable man, believed, to be taken into consideration."

Under the circumstances, we are of the opinion that the jury was fairly apprised of the law relating to a homicide committed in defense of a close relative and, accordingly, find no prejudicial error by the trial court in refusing to grant the instruction as submitted.

### III

The appellant also alleges error in the trial judge's refusal to grant his motion for a Judgment of Acquittal at the conclusion of the entire case. In *Brooks v. State,* 3 Md. App. 485, a jury case, we said (at p. 511) : "In reviewing the lower court's denial of a Motion for Judgment of Acquittal, made at the conclusion of the case, the review becomes a determination of the sufficiency of the evidence." We held in *Williams and McClelland v. State,* 5 Md. App. 450, 457-458 : "The test to be applied by the Court of Appeals and this Court in determining whether the case or a particular issue was properly submitted to the jury has been stated a number of times as whether there was any relevant evidence adduced at the trial which would properly sustain a conviction." See also *Clarke v. State,* 238 Md. 11 ;. *Plumley v. State,* 4 Md. App. 671.

Voluntary manslaughter has been defined in Clark and Marshall, *Law of Crimes, supra,* p. 620, as follows :

> "An intentional homicide done in sudden passion or heat of blood caused by reasonable provocation, and not with malice aforethought, constitutes the offense of voluntary manslaughter."
> "Voluntary manslaughter is distinguished from murder by absence of malice aforethought, express or implied, but in the heat of passion or heat of blood caused by reasonable provocation."

There was evidence before the jury from which it could have found that the killings were the offspring of the appellant's passionate, yet unpremeditated, impulse to put an end to the almost inhuman behavior displayed by his father, mother and his

mother's sister, Marie Johnson, all of whom were under the influence of alcohol. The jury could well draw this conclusion on the basis of the appellant's vulgar and, obviously, intemperate remarks to his fourteen-year-old sister just prior to the shootings; his heated explanation immediately after the shootings that "I'm tired of it. I'm sick of it. I'm going to break it up, break up this fighting. I'm tired of it."; the fact that his father, just prior to being shot, was doing "nothing but standing up"; that Marie Johnson was getting up off the ground when shot; that his mother tried to prevent the shootings by holding up her hand and saying, "No."; that he whirled around after the shooting in evident anger and said to those standing in the yard: "Any of you all want it?"; and his immediate departure in his aunt's car which he commandeered at gunpoint. These are inseparable factors attendant the appellant's conduct which the jury could view as constituting the essential ingredients of the crime of manslaughter.

It is true that the appellant contended that he shot the victims "to stop them from killing my mother or doing any harm to her." The jury, however, was not required to give credence to his alleged purpose. *Brooks v. State, supra; Carroll v. State,* 3 Md. App. 50. In our opinion there was evidence legally sufficient to sustain the jury's verdict of manslaughter and, accordingly, it was not error to deny the appellant's Motion for a Judgment of Acquittal.

IV

Finally, it is contended that the lower court committed prejudicial error in permitting the State to introduce, over objection, photographs depicting the deceased father lying in the yard where he had been shot and a photograph of his body taken in the morgue showing the gunshot wound to his head. It is argued that the photographs could only serve to arouse the emotions and inflame the passion of the jury.

The admission of photographs into evidence is primarily within the discretion of the trial judge and the exercise of that discretion will not be disturbed on appeal unless clearly abused. *Culver v. State,* 1 Md. App. 406, 412. Here the photographs were offered for the purpose of showing the nature of the victim's wound and the scene of the crime. We find no abuse of

the trial court's discretion. See *Carder v. State,* 5 Md. App. 531.

*Judgments affirmed.*