996 A.2d 425

Tracy Samuel LEE a/k/a/ Tracey S. Lee

v.

STATE of Maryland.

No. 164, Sept. Term, 2009.

Court of Special Appeals of Maryland.

May 28, 2010.

46

Amy E. Brennan (Paul B. DeWolfe, Public Defender, on the brief), Baltimore, MD, for appellant.

Cathleen C. Brockmeyer (Douglas F. Gansler, Atty. Gen., on the brief), Baltimore, MD, for appellee.

Panel: EYLER, DEBORAH S., KEHOE, JAMES A. KENNEY, III, (Retired, Specially Assigned), JJ.

EYLER, DEBORAH S., J.

A grand jury in the Circuit Court for Prince George's County indicted Tracy Samuel Lee, the appellant, for first-degree murder, use of a handgun in the commission of a crime of violence, and conspiracy to commit first-degree assault. In a jury trial, the court granted the appellant's motion for judgment on the conspiracy count. The appellant was convicted of second-degree murder and use of a handgun. The court sentenced him to a term of 30 years imprisonment for second-degree murder and a consecutive term of 20 years for use of a handgun, the first five years without the possibility of parole.

On appeal, the appellant poses five questions for review, which we have rephrased slightly:

I. Did the trial court err in refusing to propound jury instructions on defense of others and imperfect defense of others?

II. Did the trial court err in permitting the medical examiner to give an expert opinion that the victim was not under the influence of phencyclidine ("PCP") at the time of his death?

III. Did the trial court abuse its discretion in excluding evidence that the victim, at the time of his death, was in possession of PCP?

IV. Did the trial court abuse its discretion in restricting defense counsel's closing argument?

V. Did the trial court abuse its discretion in admitting a photograph of the appellant and his coworkers?

For the reasons that follow, we answer these questions in the negative and shall affirm the judgments of the circuit court.

## FACTS AND PROCEEDINGS

On June 22, 2007, at approximately 2:00 a.m., the appellant shot and killed Brian Comploier in a parking lot outside of Wyvill's Tavern ("the Tavern"), also known as 301 Bar and Grill, located at 5753 Crain Highway, in Upper Marlboro. The appellant admitted to shooting Comploier. The circumstances of the shooting, however, were hotly contested.

At the time of the shooting, the appellant was 35 years old. He had been employed by the Tavern as a security officer for approximately six months. The Tavern is a bar and dance club located in a strip mall. Its parking lot services several businesses.

On the night of June 21, 2007, the appellant and his fiancée, Kim Covington, arrived at the Tavern at approximately 7:30 p.m. Covington was a waitress at the Tavern, but was not scheduled to work that evening. The appellant was scheduled to work from 7:30 p.m. until closing.[1] Also working security that evening was Mario Millender, a close friend of the

_____

1. Closing time was 3:00 a.m. according to the appellant.

appellant.[2] A third security officer, known as Kinard, was working as the bar manager.

Around 1:45 a.m. (on what by then was June 22), Comploier, age 32, was driven to the Tavern by a friend, John Christopher Loubier. The two men had spent much of the previous day together and, at some point between 2:00 p.m. and 8:00 p.m., had smoked PCP. Loubier dropped Comploier off at the Tavern and drove to a 7–Eleven to buy cigarettes. Comploier was supposed to be meeting the Tavern's owner, John Noel, for a drink. He knew Noel and other Tavern staff, including Millender, from high school. He did not know the appellant.

When Comploier arrived, he ran into Angela Osborne, nicknamed Angel, who is the mother of his child. Osborne waitressed at the Tavern, but she was not working that night. She had been socializing at the Tavern since around 11:00 p.m. with her friend Penny Hussey.

Just before 2:00 a.m., Comploier ran into Millender and the two began arguing.[3] Comploier may have spit at Millender. Millender punched Comploier in the face.

The appellant was stationed near the dance floor and witnessed the altercation. He had been about to leave the Tavern with Covington, who was not feeling well, when he saw Millender escorting Comploier out of the Tavern.[4] He and Covington followed Millender and Comploier out the front door. Osborne and several other patrons also followed them outside.

Once outside, Millender and Comploier continued to argue. Comploier ripped his own shirt off and was jumping up and

---

**2.** The appellant had known Millender for more than 25 years. Millender helped the appellant get his job at the Tavern.

**3.** There was some testimony that Comploier had recently given Millender marijuana in exchange for cocaine. Millender had returned the marijuana to Comploier and wanted Comploier to repay him for the cocaine.

**4.** There was some testimony that Kinard also helped escort Comploier out of the Tavern.

down and behaving in an erratic manner. Millender and the appellant told him to go home.

Comploier made several calls to Loubier from his cell phone, but Loubier did not answer. Loubier was on his way back to the Tavern, however, and pulled into the parking lot driving his pickup truck. He began to park his truck at the far end of the parking lot.

Before Loubier's truck had come to a complete stop, Comploier ran up to it and opened the driver's side door, yelling to Loubier that he needed his knife. Comploier grabbed Loubier's three and one-half inch blade folding knife from the console next to the steering wheel and, with the knife in hand, started back toward Millender and the appellant.

Loubier exited the vehicle, ran up to Millender, and pushed him.

Osborne approached Comploier and he displayed the knife to her. According to Osborne, she told Comploier he was acting "stupid." She took the knife from him and threw it in the direction of Loubier's truck. The appellant and Covington dispute this version of events, however. Both testified that Comploier continued to brandish the knife until the time he was shot. Loubier was unsure what happened to the knife after Comploier took it.

Comploier also retrieved a shovel from the back of Loubier's truck. He then paced back and forth, toward and away from the Tavern, holding the shovel and, by some accounts, the knife. At some point before the shooting, he dropped the shovel.

According to witnesses for the State, the appellant ran toward Comploier. According to the appellant, Comploier started toward him. By all accounts, the appellant removed a .22 caliber handgun from his waistband and shot Comploier six times.

Immediately following the shooting, the appellant and Covington reentered the Tavern. The appellant gave the hand-

gun to the Tavern's cook.[5] The appellant and Covington then left through the back door of the Tavern and drove home to Ellicott City.

Loubier, who ran onto a neighboring car dealership's property when the shooting started, called 911. Hussey was exiting the Tavern right when the shooting began; she also called 911. Osborne began to perform CPR on Comploier. The police arrived at approximately 2:05 a.m. Comploier was transported to Southern Maryland Hospital. He was pronounced dead at approximately 2:45 a.m.

The shovel was found but neither the knife nor the gun was recovered at the scene. During interviews at the scene, Osborne, Loubier,[6] and Hussey were unable to identify who had shot Comploier.[7]

The following day, Osborne called the lead detective on the case, Kelly Rogers, and identified the appellant as the shooter.

Within a few weeks of the shooting, the appellant and Covington moved to Roanoke, Virginia. They remained there until October of 2007, when Covington received a telephone call from Millender advising her that the police knew the appellant's location. At that time, the appellant took a bus to Florida to avoid apprehension.

Soon after, Covington began cooperating with the police. The appellant was arrested in Florida on December 31, 2007, and was transported back to Maryland.

The jury trial lasted from January 5 to January 8, 2009. The defense theory was that the appellant was acting in self-

---

5. The appellant and Covington testified that the handgun was owned by Noel. Security officers at the Tavern would use the gun while on duty and return it to Noel at the end of their shifts.

6. Loubier was high on drugs, by all accounts, and was behaving so erratically that police had to place him in a "time out."

7. Hussey had not witnessed the shooting. Loubier and Osborne testified that they were too scared to identify the appellant as the shooter at the scene because the other security guards from the Tavern all were there.

defense or in defense of others when he shot and killed Comploier. The State argued that the testimony and the medical and forensic evidence did not support either defense.

The State called ten witnesses, including Covington, Osborne, Loubier, Hussey, a forensics expert, a medical expert, and police officers involved in investigating the case. The medical examiner testified that Comploier was shot three times in the back and that these shots were fired within six inches of his body. This was consistent with Osborne's testimony that Comploier dropped to the ground, in a fetal position, when the appellant started shooting. She claimed that the appellant stood over him, shooting the gun.

The appellant testified on his own behalf, but called no other witnesses.

At the close of the State's case, the appellant moved for judgment of acquittal on the charge of conspiracy to commit first-degree assault. The court reserved, but granted the renewed motion at the close of all the evidence.

The jury was instructed on first and second-degree murder, as well as perfect and imperfect self-defense.

As noted above, the jury convicted the appellant of second-degree murder and use of a handgun in a crime of violence. He timely appealed his convictions. We shall include additional facts in our discussion of the issues.

## DISCUSSION

### I.

### Defense of Others

The appellant contends the trial court committed reversible error when it declined to give a requested instruction on perfect and imperfect defense of others. He argues that his testimony at trial, if believed, supported the claim that he acted in defense of patrons of the Tavern or, alternatively, of Millender or Osborne, when he shot Comploier. The State

counters that the instruction was not generated by the evidence and, accordingly, properly was denied.

"When claiming defense of others, the [defendant] has 'the burden of initially producing "some evidence" on the issue of mitigation or self-defense (or relying upon evidence produced by the State) sufficient to give rise to a jury issue with respect to these defenses[.]'" *Dishman v. State*, 118 Md.App. 360, 376, 702 A.2d 949 (1997) (quoting *State v. Evans*, 278 Md. 197, 208, 362 A.2d 629 (1976)), *rev'd on other grounds*, 352 Md. 279, 721 A.2d 699 (1998). As the Court of Appeals explained in *Dykes v. State*, 319 Md. 206, 216–17, 571 A.2d 1251 (1990), with respect to self-defense:

> *Some evidence* is not strictured by the test of a specific standard. It calls for no more than what it says—"some," as that word is understood in common, everyday usage. It need not rise to the level of "beyond reasonable doubt" or "clear and convincing" or "preponderance." The source of the evidence is immaterial; it may emanate solely from the defendant. It is of no matter that the self-defense claim is overwhelmed by evidence to the contrary. If there is any evidence relied on by the defendant which, if believed, would support his claim that he acted in self-defense, the defendant has met his burden.

(Emphasis in *Dykes*.)

Thus, we turn to the evidence relied upon by the appellant at trial in support of his claim of defense of others to determine if he met his burden of producing "some evidence." The appellant testified that he watched Comploier run to Loubier's truck, "wrestle" with Loubier and start back toward him (the appellant) with a knife in hand. At that time, Comploier was "maybe four car lengths away" from the appellant. The appellant explained that he did not retreat to the Tavern because "people were out there circling around, so I had to stay in between them and keep them secure . . . away from him because he had a weapon." He stated that it was his "job [ ] to secure the premises and the patrons there, as well as myself and my co-worker."

The appellant further testified that he walked toward Comploier, but stopped about two car lengths away from him. He told Comploier "to put the knife down." Comploier did not comply. At this time, Millender was standing to the appellant's left. The appellant saw Osborne run up to Comploier, slap him in the face, and scream at him. Comploier "put the knife to her throat" and she walked away from him. At the same time, Loubier ran up to Millender, pushed him, and the two began arguing.

The appellant described the moments immediately before the shooting as follows:

> I turned to my left to see what was going on and observe the situation, I looked back at [Comploier] because the people standing to my right side were patrons and he, as I looked at him, he was coming towards me. He had the knife up in the air like this (indicating), as though he was going to stab me, so therefore in order for me not to get hurt or anyone behind me, I had to brandish my gun and told him, man, get back. He kept coming towards me, so I had to shoot him.

Defense counsel asked why the appellant didn't retreat when he saw Comploier approaching with the knife. He replied, "[b]ecause it was people standing behind me. If I was to leave, maybe one of those people would get hurt."

At the close of the evidence, the appellant asked the trial judge to instruct the jury on defense of others, perfect and imperfect. The requested instruction read, in pertinent part:

> You have heard evidence that the defendant killed (victim) in defense of another person. You must decide whether this is a complete defense, a partial defense, or no defense in this case.
>
> In order to convict the defendant of murder, the State must prove that the defendant did not act in either complete defense of another person or partial defense of another person. If the defendant did act in complete defense of another person, the verdict must be not guilty. If the defendant did not act in complete defense of another person,

but did act in partial defense of another person, the verdict should be guilty of voluntary manslaughter and not guilty of murder.

Defense of another person is a complete defense, and you are required to find the defendant not guilty, if all of the following four factors are present:

(1) the defendant actually believed that the person defended was in immediate and imminent danger of death or serious bodily harm;

(2) the defendant's belief was reasonable;

(3) the defendant used no more force than was reasonably necessary to defend the person defended in light of the threatened or actual force; and

(4) the defendant's purpose in using force was to aid the person defended.

In order to convict the defendant of murder, the State must prove that defense of another person does not apply in this case. This means that you are required to find the defendant not guilty, unless the State has persuaded you, beyond a reasonable doubt, that at least one of the four factors of complete defense of another person was absent.

Even if you find that the defendant did not act in complete defense of another person, the defendant may still have acted in partial defense of another person. [If the defendant actually believed that the person defended was in immediate and imminent danger of death or serious bodily harm, even though a reasonable person would not have so believed, the defendant's actual, though unreasonable, belief is a partial defense of another person and results in a verdict of voluntary manslaughter rather than murder.] [If the defendant used greater force than a reasonable person would have used, but the defendant actually believed that the force used was necessary, the defendant's actual, though unreasonable, belief is a partial defense of another person and the verdict should be guilty of voluntary manslaughter rather than murder.]

*Maryland Criminal Pattern Jury Instruction* 4:17.3 ("MCPJ") (brackets in original).

Defense counsel argued in support of the requested instruction as follows:

> Mr. Lee testified that one of the reasons that he did not turn around and retreat is because he had a duty to all of the patrons while Mr. Comploier was out there, still acting erratically, still brandishing a knife, he didn't feel like he could turn his back on all of the people for whom he was responsible, given the fact that Mr. Comploier had brandish[ed] a knife, put it at Angel's throat, and that he was still armed and dangerous at the time. So, he, by virtue of his job and by virtue [of] his testimony, was responsible for the people in the parking lot as well.

The trial court denied the requested instruction, opining as follows:

> I just don't believe—there was no evidence that Mr. Comploier had directly threatened anyone, but that Mr. Lee was speaking to people behind him, and that was the reason why he couldn't retreat because he had to protect those individuals. I just don't believe that's the case in this matter.

 Defense of others, like self-defense, is a justification or mitigation defense. If the appellant proved that he was acting in perfect defense of others, *i.e.*, that he held a subjectively genuine and objectively reasonable belief that he had to use force to defend another against immediate and imminent risk of death or serious harm *and* the level of force he used was objectively reasonable to accomplish that purpose, he would be entitled to an acquittal on the murder charge.[8] *See* Judge Charles E. Moylan, Jr., *Criminal Homicide Law* 194

---

**8.** The appellant also would have to show that he was not the initial deadly aggressor or the person who escalated the offense to the deadly level. *See* Judge Charles E. Moylan, Jr., *Criminal Homicide Law* 194 (2002). Those also are elements of a claim of self-defense. Because the trial court instructed the jury on self-defense in the instant case, we must assume the court was persuaded that the appellant met his burden with respect to these elements.

(2002). On the other hand, if the appellant held an actual belief that he had to use force to defend another, but his belief was not objectively reasonable and/or the level of force he used was not objectively reasonable, the result would be to mitigate "what might otherwise be murder down to the manslaughter level." *Id.* at 193. The former is the "perfect" or "complete" form of the defense; the latter is the "imperfect" or "partial" form. *Id.*

We will begin with a discussion of the reported Maryland cases touching on defense of others—in either of its forms. In *Guerriero v. State*, 213 Md. 545, 132 A.2d 466 (1957), the Court of Appeals considered whether the trial judge, sitting as the trier of fact, erred in finding a defendant guilty of assault, rejecting a defense of others defense. The defendant's brother had become involved in an altercation with a third party outside the defendant's family's grocery store after the brother temporarily blocked the roadway with his truck. The defendant shot the alleged attacker in the ankle.

The Court stated the common law rule that

[a] third person, closely related to or associated with one attacked [9] in such a manner that he could properly have defended himself by the use of force, has a right to go to the defense of the person attacked and to use the same degree and character of force that the one attacked could have used.

*Id.* at 549, 132 A.2d 466. The Court noted that the brother's subjective belief as to whether he was in danger was "of vital importance in passing on the appellant's legal right to react to real or apparent danger to [his brother] in the manner he did." *Id.* at 550, 132 A.2d 466. In concluding that the verdict

---

**9.** At common law, a defendant only could justifiably use force in defense of another if he or she was "closely related to or associated with" the person defended. *Guerriero, supra,* 213 Md. at 549, 132 A.2d 466. This restriction was imposed "because the right evolved not from the right of self-defense, as most cases imply, but from the right to protect one's property." *Alexander v. State,* 52 Md.App. 171, 172–73, 447 A.2d 880 (1982). This limitation on the defense is no longer applicable. *Id.* at 177–78, 447 A.2d 880.

was supported by the evidence, the Court emphasized that the brother, who was in the driver's seat of his truck when he allegedly was attacked, could have driven away or retreated to the safety of the grocery store, but did not.

In *Tipton v. State*, 1 Md.App. 556, 232 A.2d 289 (1967), a father witnessed his three teenaged sons being attacked by an older man. The oldest son had had both of his arms amputated. The father shot and killed the attacker as he was about to throw a large rock at the oldest son. The father was indicted for murder and for carrying a concealed weapon. There was evidence presented at trial that the oldest son had approached the deceased after the deceased had stopped attacking one of the brothers and had kicked the deceased about the legs and ankles. The father asked for a jury instruction stating that he had a right to use force in defense of another even when the person being defended may have been an aggressor in the altercation, so long as the actions of the person being defended were "not likely or calculated to cause death or great bodily harm." *Id.* at 560, 232 A.2d 289. The trial court declined to give the instruction and, in fact, instructed the jury that if the defendant "knew, or as a reasonable person should have known under the circumstances that the person whom he was acting to defend was the aggressor and had provoked a conflict, then his killing in defense of that person would not be justifiable or excusable." *Id.* at 562, 232 A.2d 289.

We reversed the judgments of the circuit court, holding that the requested instruction was a correct statement of the law. In so ruling, we reaffirmed the principle in *Guerriero,* with slight modification:

> [A] third person, who is clearly related to or associated with the person subjected to the excessive and unreasonable force of the counterattack, has a right to go to the defense of that person and to use the same degree and character of force that the person presently being attacked could have used to defend himself.

*Id.* at 562, 232 A.2d 289.

Two years later, in *Gray v. State,* 6 Md.App. 677, 253 A.2d 395 (1969), we affirmed the murder conviction of a 16–year old

boy who shot and killed his father and maternal aunt after they attacked his mother. The defendant argued that the trial court erred by declining to give a jury instruction entitled, "Acting on Appearances," which stated, in substance, "that it is not necessary that there shall be an actual danger to entitle a person to defend himself or a close relative; a *reasonable appearance of danger* is enough to justify the homicide." *Id.* at 685, 253 A.2d 395. We concluded that this instruction would have been cumulative because the self-defense instruction given by the trial court had included the following:

> [I]n order to justify or excuse the killing of another on the ground of self defense, it is necessary to establish that the defendant
>
> \* \* \*
>
> believed at the time he was, or a person close to him or some close relative, was in immediate danger of losing his or her life, or suffering serious bodily harm and believed it necessary in the protection of that life of another to save that person. . . .

*Id.* at 685, 253 A.2d 395. The court's instruction further had clarified that "the test of self defense is not what the jury thinks a reasonable man would believe, but rather what the defendant, as a reasonable man, believed, to be taken into consideration." *Id.* at 685–86, 253 A.2d 395.

Thirteen years later, in *Alexander, supra,* 52 Md.App. 171, 447 A.2d 880, this Court considered the historical right of intervenors to act in protection of third persons. We recognized the view, expressed in "strong dicta" in *Guerriero,* and later by this Court in *Tipton,* that a defendant's right to act in defense of others is coterminous with the right of the person defended to act in defense of himself. Under this view of the defense, the defendant " ' "stands in the shoes" of the one defended with exactly the same privilege or lack of privilege as possessed by the latter.' " *Alexander, supra,* 52 Md.App. at 174–75, 447 A.2d 880 (quoting R. Perkins, *Criminal Law* at 1020 (2nd ed. 1969)). We concluded, however, that the "more

enlightened view," "approved instinctively" in *Gray,* should prevail, that "one who is himself free from fault may intervene and use force to protect an innocent victim of intended crime. And under the sound view he is protected by the usual mistake-of-fact doctrine and may act upon the situation as it reasonably seems to be." *Id.* at 177, 447 A.2d 880 (quoting Perkins, *supra,* at 1021).

We also considered the impact of a "Good Samaritan" statute enacted in 1965 in the wake of the Kitty Genovese case in New York City.[10] Then codified at Md.Code (1982 Repl. Vol.), Art. 27, section 12A,[11] the statute provided:

> Any person witnessing a violent assault upon the person of another may lawfully aid the person being assaulted by assisting in that person's defense. The force exerted upon the attacker or attackers by the person witnessing the assault may be that degree of force which the assaulted person is allowed to assert in defending himself.

We noted that it was "the *witnessing* of the violent assault ... which affords protection for the intervenor" and the faultlessness, *vel non,* of the apparent victim was not referenced. *Alexander,* 52 Md.App. at 178, 447 A.2d 880.

---

**10.** In 1964, Kitty Genovese was stabbed to death near her home in the Queens Borough of New York City. The *New York Times* reported that her stabbing death was witnessed by 38 people, none of whom came to her assistance. "Thirty–Eight Who Saw Murder Didn't Call the Police," *The New York Times,* March 27, 1964. The Kitty Genovese case became a prime example of the so-called "bystander effect," *i.e.,* that the more witnesses there are to a crime as it is unfolding the less likely it is that any of them will intervene on behalf of the victim.

**11.** In 1996, the legislature made significant amendments and revisions to the criminal code, including the repeal of Section 12A. It was replaced with a section entitled, "Defenses," which stated: "A person charged with a crime under [the Assault subheading] ... may assert any judicially recognized defense." Md.Code (1996 Repl. Vol., Art. 27A–3). The committee notes state that this revision was intended to ensure that the repeal of the former section was not understood as a repeal of the defense available under former section 12A, nor an abrogation of the extension of this defense recognized in *Alexander, supra,* to a person who reasonably believes that another is being assaulted. This provision is now codified at Md.Code (2002, 2009 Supp.) section 3–209 of the Criminal Law Article.

The *Alexander* Court then turned to the facts. The defendant was a prisoner in a correctional facility who had assaulted a guard after witnessing the guard violently subduing a fellow prisoner. The events precipitating the guard's actions were in dispute, but the other prisoner—a co-defendant—implicitly conceded that he was the initial aggressor. He also testified, however, that the defendant did not witness his acts of aggression and only witnessed the reaction of the guards. The trial court instructed the jury that the defendant's right to act in defense of his fellow prisoner was equivalent to the right of the fellow prisoner to act in self-defense. The court further explained that if the jurors were to find the co-defendant guilty "then it necessarily follows that the defendant [ ] cannot claim that right of self-defense on the basis that he was trying to protect" the co-defendant. *Id.* at 179, 447 A.2d 880. We reversed the judgments of the circuit court, holding that the instruction was in error under the Good Samaritan statute and our interpretation of the current status of the law on defense of others. We explained that "an intervenor's right to react is not strictly coterminous with a participant's right to self-defense." *Id.* at 183, 447 A.2d 880.

In *Shuck v. State*, 29 Md.App. 33, 349 A.2d 378 (1975), this Court reversed a defendant's conviction and remanded for a new trial based, in part, upon a finding of error in the trial court's failure to instruct on imperfect defense of others. In that case, the defendant's friend was being attacked by two unarmed men. The defendant retrieved a baseball bat from the friend's car and hit the attackers at least twice with it, killing one of them. Citing *Guerriero* and *Tipton*, we concluded that, while the evidence was such that the defendant was not entitled to an instruction on perfect defense of others, because he unreasonably escalated a non-deadly combat to the deadly level, he was entitled to an instruction on imperfect defense of others. We noted that the defendant's friend was "neither an aggressor nor a mutual combatant" and "was under unprovoked attack from at least one and possibly two persons." *Id.* at 41, 349 A.2d 378. We also cited to the "Good Samaritan" statute, however, with respect to the level of force the defendant would be entitled to use in defense of his friend.

Lastly, in *Dishman, supra,* 118 Md.App. at 378, 702 A.2d 949, we rejected a defendant's contention of error premised on the trial court's failure to instruct on defense of others when the only evidence supporting the instruction was a statement the defendant made to the police that his friend and the victim had quarreled, "they both 'threw a couple of punches,'" and the victim grabbed his friend by the hair.[12] We concluded that the defendant "utterly failed to put forth *any* evidence that he believed [his friend] to be in 'immediate and imminent' danger of death or serious bodily harm[.]" *Id.* (emphasis in original).

A common thread running through the cases in which the defense of defense of others has been recognized or an instruction on the defense was found to be generated by the evidence is that the person being defended was coming under direct attack when the defendant came to his or her defense. *See, e.g., Shuck, supra* (defendant's friend was being beaten by one or two men); *Alexander, supra* (fellow prisoner was being physically subdued by a prison guard). The "Good Samaritan" statute cited in *Alexander* and *Shuck* similarly required the "witnessing [of] a violent assault upon the person of another," not a potential assault or a general threat of violence.

In contrast, in the case at bar, under the facts adduced at trial taken in a light most favorable to the appellant's defenses, Comploier "was coming towards [the appellant]" when the appellant drew his gun and shot him six times. There was no evidence that any patron, aside from Osborne, had been threatened by Comploier or that he had assaulted anyone except, possibly, Millender. At the time of the shooting, however, Millender was involved in an altercation with Loubier, and was not under attack by Comploier. Similarly, Osborne had "walked away" after Comploier put the knife to her throat; she was not under attack when the appellant shot

---

12. The cause of the victim's death was not revealed, probably because the defendant set her body on fire in an attempt to conceal the crime.

Comploier. The appellant did not testify about the number of patrons in the area at the time of the shooting and their approximate distance from Comploier.

The facts adduced at trial did not include "some evidence" that the appellant actually believed when he shot Comploier that any other person—patron or coworker—was in immediate and imminent danger from Comploier, much less that he held an objectively reasonable belief of the same. The appellant's testimony that, had he retreated, "*maybe* one of those people would get hurt," could not support a reasonable inference that he actually believed such harm was imminent or immediate. He did not testify that he thought a patron would be killed or otherwise seriously injured if he retreated.[13] As defense of others was not generated as a defense at trial, the appellant was not entitled to a jury instruction about it, as a matter of law. *See Evans*, 278 Md. at 208, 362 A.2d 629.

■ The defense of defense of others may not serve to justify or mitigate the use of deadly force when the person ostensibly being defended is not being attacked and is not even the target of a threatened attack. In this case, the trial testimony favorable to the appellant was to the effect that Comploier was involved in an altercation with the Tavern security staff in which he was brandishing a knife, but that he was not using the knife or threatening to use the knife against patrons. A private security guard is not privileged to use deadly force to defend patrons who are milling about during a fight. The defense of others instruction properly was denied.

## II.

### Medical Examiner's Testimony

■ The appellant's next contention concerns the testimony of the medical examiner, Mary Ripple, M.D. According to the

---

**13.** Under the principle stated in *Guerriero*, but questioned in several cases decided by this Court, that the appellant stands in the shoes of the person(s) defended, it is clear that the patrons would not have been entitled to a perfect or imperfect defense instruction under the facts of this case.

appellant, the State failed to give him timely notice that Dr. Ripple would opine that Comploier was not under the influence of PCP when he was shot; he (the appellant) then moved to exclude that aspect of Dr. Ripple's testimony as a sanction for the discovery violation; the trial court failed to rule on the motion; and, by not ruling, the court erred by "fail[ing] to exercise its discretion under Rule 4–263(n) to determine what if any sanctions should have been imposed upon the State." In particular, the court failed to consider whether to exclude that testimony or whether to grant a continuance so the appellant could obtain testimony to counter Dr. Ripple's.

The State responds that the appellant failed to timely raise this issue before the trial court; he did not seek a continuance below and, accordingly, waived that aspect of his contention for purposes of appeal; there was no discovery violation; if there was a discovery violation, exclusion of the evidence would not have been a proper remedy; and any error was harmless.

The jurors heard testimony during the State's case that PCP was Comploier's drug of choice and that he and Loubier had smoked PCP between 2:00 p.m. and 8:00 p.m. in the afternoon and evening immediately preceding the shooting. They also heard testimony from Covington that, at the time of the shooting, Comploier was acting in an erratic manner; was "agitated" and "amped up"; and was jumping up and down, ripping off his shirt, and brandishing a knife toward men he knew to be armed with guns. Finally, there was evidence that Osborne had told Detective Rogers that Comploier "wasn't that high, I've seen him higher. He was buzzed."

At the time of his death, as we shall discuss further, Comploier had two vials containing a total of 2.15 grams of PCP in his pocket. The trial court excluded this evidence, however, over defense counsel's objection.

As part of Comploier's autopsy, blood from his heart and bile from his liver were tested for the presence of several illegal substances, including PCP. His blood also was tested for the presence of alcohol. The resulting toxicology report,

dated June 26, 2007, was appended to the autopsy report, dated July 17, 2007, and was timely turned over to defense counsel. The toxicology report revealed that PCP was present in Comploier's bile, but not in his blood. It also revealed the presence of dextromethorphan (cough suppressant) and morphine in Comploier's bile and the presence of benzoylecgonine, a metabolite of cocaine, in his blood and bile. There was no alcohol detected in Comploier's blood.

The autopsy report included a section entitled "Opinion," in which Dr. Ripple opined that Comploier died of gunshot wounds to the head, neck, back, and arm; described the nature of the gunshot wounds and the proximity of the gun to Comploier when it was discharged; and concluded that Comploier "had not been consuming alcoholic beverages prior to his death."

The day before the start of the trial, the State informed defense counsel that Dr. Ripple would testify that Comploier was not under the influence of PCP at the time of the shooting based on the location of the PCP in his body (*i.e.*, in his bile, but not in his blood). Defense counsel did not file a motion *in limine* or request any relief based on that information before the trial.

At trial, upon conclusion of *voir dire*, defense counsel made an oral motion *in limine* to exclude Dr. Ripple's anticipated testimony that Comploier was not under the influence of PCP when he was shot. He so moved on two bases: 1) the State had failed to give notice of the opinion as required by Rule 4–263(d)(8)(c); [14] and 2) the opinion was outside Dr. Ripple's area of expertise. The prosecutor asked the court to reserve ruling until Dr. Ripple could be *voir dired* about her qualifications and background. The court reserved.

Dr. Ripple was the State's last witness. Before she was called to the stand, defense counsel renewed his motion *in*

---

**14.** Under Rule 4–263(d)(8)(c), the State must provide to the defense, without the necessity of a request, "the substance of any oral report and conclusion by [each expert consulted by the State's Attorney in connection with the action.]."

*limine* and argued that, although the State had timely provided Dr. Ripple's report, the report did not disclose an opinion that Comploier had not been under the influence of PCP at the time of the shooting. According to defense counsel, the State had "the affirmative duty to let me know what [Dr. Ripple's] oral conclusions will be." He stated that, had he known that Dr. Ripple would render such an opinion, he "would have consulted with an expert to reach a different conclusion, if appropriate."

The State responded that it had complied fully with its discovery obligations by turning over Dr. Ripple's report and that "it was [the prosecutor's] understanding [that defense counsel] was under full understanding that that information would be elicited from the medical examiner concerning what level of intoxication it is."

Defense counsel countered that Dr. Ripple's report specifically noted her opinion that Comploier was not under the influence of alcohol at the time of the shooting, but made no other reference to the toxicology report. He argued that the purpose of the discovery rules is to put the defendant on notice of the State's expert's ultimate conclusions and that Comploier's level of intoxication was such a conclusion.

The court again reserved on the motion.

Before questioning Dr. Ripple about the toxicology report, the prosecutor asked for a bench conference for the judge's ruling on the motion *in limine*. The prosecutor proffered that Dr. Ripple would testify about where the various substances tested for were found in Comploier's body and "obviously when they possibly could have been ingested into the body based on her medical training." Defense counsel responded that he had no objection to the toxicology report being moved into evidence or to Dr. Ripple's testifying as to where each substance was found in Comploier's body; he was objecting, however, to any conclusions Dr. Ripple would draw from the toxicology report that are "A, based on the discovery violation, not admissible, and, B, based on the predicate that's being relaid outside of her field of expertise."

After a colloquy with the court concerning the substance of Dr. Ripple's anticipated testimony, the court indicated that it intended to give the State "some leeway to lay the proper foundation." The following discussion ensued:

[DEFENSE COUNSEL]: Foundation aside, I made my objection based on a discovery violation. He's telling you that he's calling her as an expert. In order to lay the foundation, he's laying the foundation to make her an expert, not an expert in forensic pathology, but in this case an expert in toxicology.

[PROSECUTOR]: Let me ask the doctor. I believe forensic pathology—

\* \* \*

[DEFENSE COUNSEL]: I would need to be put on notice of the substance of her oral statements. That's an oral statement. It's not part of the report.

[PROSECUTOR]: This is the toxicology. It's part of the report.

[DEFENSE COUNSEL]: The toxicology is part of the report. Her con[cl]usions, her medical expert conclusions about the toxicology are discoverable and must be handed over to me.

THE COURT: Okay. It's overruled. Lay the foundation if you can.

Thereafter, the State inquired as to Dr. Ripple's expertise and it was revealed that she holds a Master's degree in toxicology. She proceeded to testify that PCP was found in Comploier's bile, but not in his blood.

At that point, the prosecutor again asked to approach the bench and at the bench advised the court and defense counsel that he was "now going to ask [Dr. Ripple] what it means to have drug in the bile, *and then I am going to ask her opinion as to what these results mean, essentially.*" (Emphasis added.) Defense counsel objected, arguing that the expert foundation was inadequate for a number of reasons. After the court indicated that it intended to allow the questions, defense

counsel asked to "further make the record clear." He made a number of arguments, but no request for a ruling that Dr. Ripple be precluded from testifying that Comploier was not under the influence of PCP when he was shot and no request for a continuance.[15]

The prosecutor resumed questioning Dr. Ripple. He inquired as to when Comploier likely ingested the PCP and whether he was under the influence of PCP when the shooting occurred. Dr. Ripple opined that, "since [PCP was] not in the blood, the person is not considered under the influence [ ] since it's not in the blood. He's taken those hours before, not immediately before he died."

We conclude that the appellant waived any objection to this testimony being admitted on the grounds of a discovery violation when he failed to object and seek relief on that basis at the crucial moment immediately before the prosecutor questioned Dr. Ripple about her expert opinion on this subject. And it was the appellant's failure to object at the critical time that resulted in the court's not ruling on the alleged discovery violation issue, and therefore not making a decision about a sanction.

 Pursuant to Rule 4-323, "[a]n objection to the admission of evidence shall be made at the time the evidence is offered or as soon thereafter as the grounds for objection become apparent." *See also Kang v. State,* 393 Md. 97, 119, 899 A.2d 843 (2006) (discussing the contemporaneous objection rule). An unsuccessful motion *in limine* to exclude certain evidence does not absolve the moving party of his or her duty to object at the time the evidence sought to be excluded actually is admitted. *See Prout v. State,* 311 Md. 348, 356, 535 A.2d 445 (1988) ("If the trial judge admits the questionable

---

**15.** Defense counsel stated that, had he known Dr. Ripple was going to testify as an expert about the significance of PCP being found in the bile and not the blood, he would "have requested an independent review by a toxicologist of the blood heart samples, as well as the bile samples to determine whether or not that existed." He also complained that the toxicology report was inadmissible hearsay because it was not prepared by Dr. Ripple.

evidence, the party who made the motion ordinarily must object at the time the evidence is actually offered to preserve his objection for appellate review."); *Hickman v. State*, 76 Md.App. 111, 117, 543 A.2d 870 (1988) ("Whether the motion *in limine* is made before trial or during trial, a court's ruling which has the effect of admitting contested evidence does not relieve the party, as to whom the ruling is adverse, of the obligation of objecting when the evidence is actually offered.").

Defense counsel was making two distinct arguments as to why Dr. Ripple should not be permitted to opine that Comploier was not under the influence of PCP: 1) that the State failed to give timely notice that she would so opine and 2) that she was not qualified as an expert in toxicology.[16] A review of the transcript reveals that defense counsel made his discovery argument three times. It first was made immediately following *voir dire*. At that point, the trial court reserved on the motion. It next was made immediately before Dr. Ripple was to testify. The trial court again reserved. It was made for the third time at the bench, when the prosecutor was ready to begin questioning Dr. Ripple about the toxicology report. It was at the conclusion of this bench conference that the trial judge stated, "It's overruled. Lay the foundation if you can."

As the appellant acknowledges, the trial court did not make a ruling on the discovery motion on its substance. Rather, as the appellant puts it,

> [t]he court ignored the fact that the State had violated the discovery rules . . . and instead based its ruling on the belief that Dr. Ripple probably was qualified to give her opinion about the significance of the PCP found in Mr. Comploier's bile. The fact that she may have been qualified to give the opinion does not resolve the issue of the discovery violation, however.

---

**16.** The appellant only raises the discovery argument on appeal. It appears from the colloquy below that, until Dr. Ripple's credentials were elicited on *voir dire*, neither counsel realized that Dr. Ripple had a Master's degree in toxicology and therefore plainly was qualified to testify about the toxicology results.

Immediately thereafter, the prosecutor proceeded to lay the foundation to qualify Dr. Ripple as an expert in toxicology. After establishing that Dr. Ripple held a Master's degree in that field, he approached the bench again and informed defense counsel and the court that he was about to inquire into Dr. Ripple's conclusions, specifically, "what it means to have drug in the bile" and not the blood. This was the crucial moment when the testimony the appellant previously had sought to exclude based on the asserted discovery violation would come before the jury. Because, as we have explained, defense counsel's motion *in limine* remained undecided, he was obligated to interpose an objection to the proposed testimony or otherwise request a ruling on his motion.

Defense counsel in fact lodged an objection, but not on the ground of a discovery violation. The objection was made on several specific grounds relating to Dr. Ripple's qualifications to testify, none of which are raised on appeal. *See Anderson v. Litzenberg*, 115 Md.App. 549, 569, 694 A.2d 150 (1997) ("If counsel provides the trial judge with specific grounds for an objection, the litigant may raise on appeal only those grounds actually presented to the trial judge. All other grounds for the objection . . . are deemed waived."). He did not reassert his objection on the discovery ground. This was the point in time when the trial judge, having been satisfied that Dr. Ripple was qualified to render an expert opinion on the subject of toxicology, could have determined whether a discovery violation had occurred and, if so, whether Dr. Ripple's opinion, which she was qualified to express, nonetheless should have been excluded as a sanction for the discovery violation.

This also was the time when the trial judge could have considered the grant of a brief continuance or other appropriate remedy to afford the appellant the ability to rebut Dr. Ripple's conclusions, if possible. A continuance was never requested by the appellant at any time, however. The reason the trial court ultimately did not decide whether a discovery violation had occurred that would warrant the imposition of a sanction, and did not exercise any discretion as the appellant now argues it should have, is that the appellant did not seek a

ruling and request a sanction at the very time the court was in a position to make a ruling. Having failed to object and seek a sanction at the critical time on the ground he raises on appeal, the appellant has waived any claim of error.

## III.

### Evidence of PCP Possession

■■■ The appellant next contends the trial court abused its discretion by excluding evidence that Comploier had 2.15 grams of PCP in his pocket when he was shot and killed. The State responds that this evidence properly was excluded because it was not relevant and that, "even if marginally probative, the prejudicial impact of the evidence outweighed its probative value."

The issue was the subject of an oral motion *in limine* by the State at the conclusion of *voir dire*. The prosecutor argued that evidence that Comploier was in possession of the PCP was "immaterial and irrelevant" and, in any event, so highly prejudicial as to be inadmissible. He acknowledged that evidence that Comploier was behaving in a manner consistent with being high on PCP could be relevant to the appellant's claim of self-defense. He argued, however, that Comploier's actual possession of PCP was not probative of this issue and would "cast a cloud over the victim that somehow he was a drug dealer or a drug user."

Defense counsel countered that evidence that Comploier was in possession of PCP when he was shot and killed was highly probative of whether he was high on PCP at that same moment. He also argued that the evidence was minimally prejudicial because several State's witnesses would testify that Comploier regularly used PCP and, in fact, had smoked PCP earlier on the day he was shot. Finally, defense counsel disputed that the evidence would be used to create an inference that Comploier was a dealer and, by extension, a bad actor for whom a jury might feel little compassion.

The court granted the State's motion, opining:

I believe the prejudicial value outweighs any probative value in as much as just because the person was in possession ipso facto does not mean that he was under the influence. If you have a toxicologist, someone who is going to come in and whatever you all believe the evidence is, I'll listen to the evidence. But, I believe at this juncture to allow the testimony, the introduction of evidence that because he was in possession means that he was under the influence, the Court grants the motion.

During Detective Rogers's testimony, defense counsel asked the court to reconsider its ruling on the ground that the evidence adduced by that point in the trial could support a reasonable finding that Comploier was acting in a manner consistent with his being high on PCP when the shooting took place. He argued that the State was attempting to "minimize or eliminate the possibility" that Comploier was high and would also be putting on testimony from Dr. Ripple to this effect. He argued that possession of PCP was evidence tending to make more probable the fact that Comploier was high on PCP. Finally, he asserted that, to the extent the jury might infer from the evidence that Comploier was a drug dealer—not a drug user—that would accrue to the State's benefit.

The prosecutor reiterated his argument that the evidence at issue was not probative of whether Comploier was high on PCP and was highly prejudicial in any event.

The court denied the motion to reconsider, opining:

... I'm probably more convinced that the ruling I made earlier was the correct ruling because the evidence that I've heard from basically people in close contact with the decedent indicated, basically, that he may have used up to eight o'clock and his behavior was erratic, whatever, he was amped up, he was buzzing, whatever that may be, but I do not believe that it is relevant, and it would be far more prejudicial to say just because the person is in possession of some controlled dangerous substance, more particularly

here PCP, that he was under the influence of it, and I would deny the request once again.

■■■ "A trial judge's decision to admit or exclude evidence will not be set aside absent an abuse of discretion." *Gerald v. State*, 137 Md.App. 295, 304, 768 A.2d 140 (2001). The determination of whether evidence is relevant, *vel non*, is committed to the sound discretion of the trial court. *Merzbacher v. State*, 346 Md. 391, 413, 697 A.2d 432 (1997). We perceive no abuse of discretion by the trial court in concluding that evidence that Comploier possessed PCP at the time of his death was not minimally probative of whether he was under the influence of PCP and likely would confuse the jury on the issues. Defense counsel acknowledged that he could not ask the jury to draw an inference from Comploier's possession of PCP when he was shot that he was under the influence of it at the same time. Furthermore, there was no evidence that the appellant had any knowledge that Comploier was in possession of PCP, so the fact of possession could not have affected his appraisal of the situation.

Moreover, defense counsel did not articulate to the trial court how his self-defense and/or defense of others claims would be buttressed by evidence that Comploier actually was high. Nor is that point argued on appeal. Thus, even if the evidence of possession were probative of whether Comploier was high, it is not clear how this fact would have been relevant. The issue before the jury was whether the appellant held the actual belief—objectively reasonable or not—that Comploier represented an immediate and imminent serious threat to him. If Comploier were acting as if he were high on PCP—as several witnesses testified—then the jury could find that the appellant was objectively reasonable in taking that information into account in assessing the level of threat posed by him.[17] Whether Comploier actually was high on PCP was

---

17. We also note that there was no testimony by the appellant that he thought Comploier was high; that he was familiar with the way a person who is high on PCP might act; or that he took this into account in deciding to shoot Comploier. And, because the appellant did not

not relevant to the determination. And, if it were minimally relevant, the trial judge did not abuse his discretion in concluding that the prejudicial effect of the evidence far outweighed its probative value.

## IV.

### Restriction of Defense Counsel's Closing Argument

 The appellant contends the trial court abused its discretion when it restricted certain aspects of defense counsel's closing argument. The State counters that the appellant failed to preserve this issue for review and that any error was harmless beyond a reasonable doubt because the appellant made the argument he claims was restricted by the court, in any event.

We begin by reproducing the relevant portions of defense counsel's closing argument:

[DEFENSE COUNSEL]: How would you react if somebody had a knife in your face and you have a gun in your hand, and you'[re] being threatened? You would shoot in all likelihood or you would be stabbed. Because think about it, I mean let's be honest, this case could be flipped around. Put [the] jury over here. You put, unfortunately, a grieving family on this side—

[PROSECUTOR]: Objection, Your Honor.

THE COURT: Sustained.

[DEFENSE COUNSEL]: What you got is you got a story where Brian [Comploier] stabbed the bouncer at a bar, and he's being charged with murder.

[PROSECUTOR]: Objection, Your Honor.

THE COURT: Sustained.

[DEFENSE COUNSEL]: Listen, this story could have ended a bunch of different ways. This is the way it ended.

\* \* \*

---

know Comploier, he would not have known that PCP was Comploier's drug of choice.

Mr. Lee was faced with a life altering decision. His life or someone else's life.

"The permissible scope of closing argument is a matter left to the sound discretion of the trial court. The exercise of that discretion will not constitute reversible error unless clearly abused and prejudicial to the accused." *Ware v. State*, 360 Md. 650, 682, 759 A.2d 764 (2000). As the Court of Appeals has explained,

> [A]s a general rule, attorneys have great leeway in closing arguments. *See Degren v. State*, 352 Md. 400, 429, 722 A.2d 887, 901 (1999). Attorneys are permitted to comment on the evidence and to state all reasonable inferences that may reasonably be drawn from the evidence. *See Wilhelm v. State*, 272 Md. 404, 412–13, 326 A.2d 707, 714 (1974). This wide latitude, however, is not unlimited and does not include the right to discuss facts not in evidence. *See Degren*, 352 Md. at 430, 722 A.2d at 901–02; *Collins v. State*, 318 Md. 269, 279, 568 A.2d 1, 6 (1990).

*Id.* at 681–82, 759 A.2d 764.

In the instant case, defense counsel's argument that Comploier would have stabbed the appellant had he not defended himself clearly was permissible. The State did not object to this line of argument and the defense counsel made it at several times. The argument at issue, however, went one step farther and suggested that Comploier easily could have been the one charged with murder and the appellant's family could have been grieving for him. We find no abuse of discretion in the court sustaining objections to this portion of closing argument. In any event, we agree with the State that no harm resulted as defense counsel continued to make the same argument, in slightly different form, after the court ruled.

## V.

### Admission of Photograph

Finally, the appellant contends the trial court abused its discretion by admitting into evidence a photograph of the

security staff of the Tavern. The State counters that the photograph was relevant and properly admitted.

The photograph depicts members of the Tavern security team, including the appellant, Millender, and Kinard. Several members of the security staff, not including the appellant, are making obscene gestures; others are displaying alcohol. Defense counsel moved *in limine* to exclude the photograph, arguing that, because identification was not an issue in the case, the photograph was not relevant. According to defense counsel, "[g]rouping [the appellant] with a bunch of, for lack of a better term, and based on that picture, a bunch of other thugs presumably, I think is prejudicial, not probative in any event[.]"

The State countered that the photograph was relevant because witnesses would testify that several of the men pictured were at the scene on the night of the shooting. It would thus permit the jurors to compare the size of the security personnel to Comploier and determine whether the security staff "could have easily dealt with any unruly patrons" without the necessity of deadly force.

The court denied defense counsel's motion *in limine*.

As the Court of Appeals explained in *Johnson v. State*, 303 Md. 487, 502, 495 A.2d 1 (1985):

> We have consistently held that whether or not a photograph is of practical value in a case and admissible at trial is a matter best left to the sound discretion of the trial judge. *Bowers v. State*, 298 Md. 115, 135–36, 468 A.2d 101, 111–12 (1983), quoting *Cook v. State*, 225 Md. 603, 608, 171 A.2d 460, 463 (1961), *cert. denied*, 368 U.S. 970, 82 S.Ct. 445, 7 L.Ed.2d 398 (1962). A court's determination in this area will not be disturbed unless plainly arbitrary. *Id.*

We have no difficulty concluding that the decision to admit the photograph was not "plainly arbitrary." It depicted several members of the security staff who were on the premises of the Tavern on the night of the shooting. It allowed the jury to get a tangible sense of the size of these individuals. This was relevant to the State's theory that the appellant could

have retreated from Comploier and sought out the assistance of Millender and Kinard, amongst others, to secure the premises without resorting to deadly force.

**JUDGMENTS AFFIRMED. COSTS TO BE PAID BY THE APPELLANT.**