*Sergey S. Danshin v. State of Maryland*, No. 39, September Term, 2024. Opinion by Eaves, J.

**CRIMINAL LAW – JURY INSTRUCTIONS – "SOME EVIDENCE" STANDARD – DEFENSE OF OTHERS**

The Supreme Court of Maryland held that there was some evidence produced at trial that petitioner, Sergey Danshin, acted in defense of another individual, Christina Jones, when he allegedly shot and killed the victim, Javier Gonzalez-Mena. Through Mr. Danshin's recorded statement made to police, which the State introduced at trial, there was some evidence that (1) Mr. Danshin shot Mr. Gonzalez-Mena because Mr. Danshin subjectively believed that Ms. Jones was in immediate or imminent danger of death or serious bodily injury, (2) Mr. Danshin's belief about the immediate or imminent harm that Ms. Jones faced was reasonable, (3) Mr. Danshin used no more force than necessary to defend Ms. Jones in light of the force threatened against her by Mr. Gonzalez-Mena, and (4) Mr. Danshin's purpose in allegedly shooting Mr. Gonzalez-Mena was to defend Ms. Jones, not to punish Mr. Gonzalez-Mena. Given that some evidence as to each element of defense of others was present, the circuit court erred in refusing to instruct the jury on defense of others after Mr. Danshin's request that it do so.

Circuit Court for Montgomery County
Case No. C-15-CR-22-000761
Argued: April 8, 2025

IN THE SUPREME COURT

OF MARYLAND

No. 39

September Term, 2024

---

SERGEY S. DANSHIN

v.

STATE OF MARYLAND

---

Fader, C.J.,
Watts,
Booth,
Biran,
Gould,
Eaves,
Killough

JJ.

---

Opinion by Eaves, J.

---

Filed: July 18, 2025

Pursuant to the Maryland Uniform Electronic Legal
Materials Act (§§ 10-1601 et seq. of the State
Government Article) this document is authentic.



Gregory Hilton, Clerk

# I
# INTRODUCTION

On the evening of June 22, 2022, Javier Gonzalez-Mena was shot and killed outside his hotel room at the Red Roof Inn in Montgomery County, Maryland. Petitioner, Sergey Danshin, eventually was charged with Mr. Gonzalez-Mena's murder. When the time came to discuss the issue of jury instructions, Mr. Danshin requested that the trial court instruct the jury on defense of others, as Mr. Danshin believed that there was some evidence presented at trial to show that his alleged shooting of Mr. Gonzalez-Mena was done to prevent imminent bodily harm to a third party, Christina Jones. The trial court rejected his request and did not instruct the jury on that defense. The jury subsequently convicted Mr. Danshin for the first-degree premeditated murder of Mr. Gonzalez-Mena. In an unreported opinion, the Appellate Court of Maryland affirmed Mr. Danshin's conviction, holding that, among other things, there was not "some evidence" that Mr. Danshin shot Mr. Gonzalez-Mena to defend Ms. Jones from imminent bodily harm or death because, in the Appellate Court's view, Mr. Danshin only ever denied shooting Mr. Gonzalez-Mena.[1]

We issued a writ of certiorari in this case[2] to answer the lone question of whether the trial court erred in declining to instruct the jury on the law of defense of others. Because we hold that there was some evidence at trial that Mr. Danshin acted in defense of Ms. Jones when he allegedly shot Mr. Gonzalez-Mena, we reverse the judgment of the

---

[1] *Danshin v. State*, No. 918, 2024 WL 4045418, at *9–10 (Md. App. Ct. Sept. 4, 2024).

[2] *Danshin v. State*, 489 Md. 275 (2024).

Appellate Court with instructions to remand this case to the Circuit Court for Montgomery County for a new trial.

## II
## BACKGROUND

The following describes the relevant events prior to Mr. Gonzalez-Mena's murder. This description is gathered from the evidence produced at trial, which ultimately led to Mr. Danshin's conviction. Our presentation of the facts here focuses on the portions of the record Mr. Danshin contends provides "some evidence" to support the defense's request for a defense of others jury instruction.

### A. *Factual Background*

Mr. Gonzalez-Mena and Ms. Jones were in a fraught and sometimes violent relationship. Mr. Danshin originally met Ms. Jones through the mobile application Telegram.[3] Through his interactions with Ms. Jones, Mr. Danshin learned of the tumultuous nature of Ms. Jones and Mr. Gonzalez-Mena's relationship. Between the late evening hours of June 19 and the early morning hours of June 20, Ms. Jones informed Mr. Danshin that, earlier in the day on June 19, Mr. Gonzalez-Mena beat her, "[t]ook [her] phone[,]" "[p]inned [her] down to the [s]eat of [a] car with his knee on [her] hair twisting [her] [breasts,]" tried to throw her in a dumpster, and said that "if [she] left he'd kill [her.]" After receiving those messages, Mr. Danshin went to meet Ms. Jones, and she spent the rest of the night with him.

---

[3] Telegram "is a messaging app that can be end-to-end encrypted." *United States v. Ostrander*, 114 F.4th 1348, 1356 (11th Cir. 2024).

After leaving Mr. Danshin's apartment around 5:30 p.m. on June 20, Ms. Jones reconciled with Mr. Gonzalez-Mena and stayed with him in the Red Roof Inn on Shady Grove Road on the following night, June 21. One of Ms. Jones's friends, Jamen Scharnberg,[4] knew of the couple's troubled history and grew concerned when Ms. Jones and Mr. Gonzalez-Mena reunited. Mr. Scharnberg became further concerned when he was unable to contact Ms. Jones for several days and relayed his concerns to Mr. Danshin. Around 5:00 p.m. on June 22, Mr. Danshin contacted a Frederick County Deputy, Keith Johnson, to report that Ms. Jones had "been missing [for] about 48 hours[,]" and that Mr. Gonzalez-Mena had attempted to kill Ms. Jones. Deputy Johnson recommended that Mr. Danshin report the alleged incident to local law enforcement. Mr. Scharnberg eventually spoke with Ms. Jones while she was at the Red Roof Inn and subsequently let Mr. Danshin know that Ms. Jones asked for Mr. Danshin's phone number so she could call him.

Later that evening, Mr. Danshin contacted two friends, Willman Quintanilla and Micah Clemons, asking for their help to retrieve a friend in danger, i.e., Ms. Jones. Mr. Clemons brought firearms, and Mr. Quintanilla drove the three men to the Red Roof Inn where Mr. Clemons and Mr. Danshin proceeded, masked and armed, to the room where Ms. Jones was staying with Mr. Gonzalez-Mena.

Once they arrived at the room, Mr. Danshin knocked on the door and attempted to check on Ms. Jones. The precise details of what happened next vary considerably among

---

[4] Mr. Scharnberg's first name appears both as "Jamen" and "Jayman" throughout the trial transcript. Both parties refer to him as "Jamen Scharnberg" in their briefs. Thus, we adopt the same spelling here.

those who had first-hand knowledge. All versions agree on the fact that there was a moment of interaction between two pairs of individuals: (1) Mr. Gonzalez-Mena and Carlos Rugamas[5] and (2) Mr. Danshin and Mr. Clemons. All versions of events have the same outcome: Mr. Gonzalez-Mena was eventually shot and killed. For purposes of this appeal, the following recitation of events focuses on the "some evidence" that Mr. Danshin believes warranted an instruction to the jury for defense of others.[6]

Shortly after the incident, Mr. Danshin sat for a recorded interview with police officers, which was later played for the jury at Mr. Danshin's trial. In that interview, Mr. Danshin reported that Mr. Gonzalez-Mena "chased [him] with [a] . . . machete away from the room when I knocked on the door." After retreating from the doorway, Mr. Danshin observed Ms. Jones with Mr. Gonzalez-Mena and saw Mr. Gonzalez-Mena pull Ms. Jones by the hair while wielding a machete. When detectives questioned Mr. Danshin about that moment, the following exchanges occurred:

> Detective Sherry: Okay. Well that's what we're asking. What happened? You're saying she's getting dragged by her hair. So tell me what happened. What did you see?
>
> Mr. Danshin: I don't want to confess to a crime.

*     *     *

---

[5] Mr. Rugamas was staying in Mr. Gonzalez-Mena's and Ms. Jones's hotel room at the Red Roof Inn at the time of the incident.

[6] The following recitation is taken from Mr. Danshin's interview with police following his arrest. We highlight this account to illustrate that, as we explain in greater detail below, it qualified as "some evidence." Determining the actual sequence of events is, of course, left to the factfinder on remand, should the State elect to retry Mr. Danshin.

4

Male Detective 1: Well why did you shoot this guy? What was it that made you do that? Because that's the point where we're at. Everything else - -

Mr. Danshin: *I mean I shot* but - -

Male Detective 1: You what?

Mr. Danshin: I'll - -

Male Detective 2: Obviously by what's going on, a guy got shot.

Male Detective 1: Right. And we know who did it. We just - - I know this is hard. Look, we've been doing this a long time. This is not easy. But what's important here is the motivation behind this.

Mr. Danshin: The motivation behind this is that I didn't shoot him, *it looked like he was going to cut her goddamn head off with the machete because he had chased me with that same machete away from the room when I knocked on the door*.

(Emphases added). Detectives continued to press Mr. Danshin on his motive:

Mr. Springer: That's the last little piece of the puzzle we're trying to see to get to the why. *Like, why did you shoot [Mr. Gonzalez-Mena]?*

Mr. Danshin: *I gave you the why.*

Mr. Springer: Well, I think I have, and I think you were trying to - -

Mr. Danshin: No. *I saw someone in imminent threat of not just bodily harm but imminent threat of lethal bodily harm and with complete knowledge that this person has hurt their victim previously on more than two occasions*, and I - -

Mr. Springer: Okay.

Mr. Danshin: - - had I shot anyone, that would be [the why].[7]

---

[7] In the written transcript, Mr. Danshin's response is written as "had I shot anyone, that would be life." In the video recording of the interview, he clearly states, "had I shot anyone, that would be the why."

(Emphases added). Finally, toward the conclusion of the interview, Mr. Danshin described to the detectives the location of the gun used in the incident.

### B. Procedural History

#### 1. The Circuit Court for Montgomery County

The State charged Mr. Danshin in the Circuit Court for Montgomery County with three counts: first-degree, premeditated murder of Mr. Gonzalez-Mena (Count I), use of a firearm in the commission of a felony (Count II), and illegal possession of a firearm (Count III). At various times throughout the trial, the circuit court addressed the issue of jury instructions. Defense counsel requested, among other instructions, the pattern jury instruction for defense of others when the individual is charged with murder.[8] In arguing for the defense of others instruction, defense counsel noted that, throughout his statement to police, Mr. Danshin "ma[de] a number of statements about why the shot would have been fired when it was[.]" In the defense's view, it was "very reasonable [for Mr. Danshin] to believe, based on everything [Mr. Danshin] knew both before that day but even just based on what happened that evening, that the person who he thought was in danger is now in the hands of a man with a machete[.]" Defense counsel asked the court to "put in[to] context" Mr. Danshin's decision to simultaneously "avoid admitting [that he] fir[ed] the shot," with "explaining why the shot would be fired[.]" Defense counsel argued that the

---

[8] The pattern jury instruction for defense of others when a defendant is charged with murder contains both a "perfect" and "imperfect" component. Perfect defense of others is a complete defense and, if successful, "entitle[s a defendant] to an acquittal on [all] charge[s]." *Lee v. State*, 193 Md. App. 45, 58 (2010). On the other hand, imperfect defense of others is a partial defense, which, if successful, would "mitigate what might otherwise be murder down to the manslaughter level." *Id.* at 59 (citation modified).

evidence "strongly suggests that, . . . while [Mr. Danshin] doesn't come right out and admit it, it's very strong, the inference that he's - - he's talking about how . . . he was in fact the one that did the shooting." While defense counsel conceded that Mr. Danshin's statement to the police raised inconsistent positions, he ultimately believed that an issue as to the defense of others had been raised and that it was "up to the jury to decide what's credible."

Citing *Lee v. State*, 193 Md. App. 45 (2010), the State argued that, in order for a defense of others instruction to be proper, a defendant must witness the assault of another and that a mere *potential* assault or threat of violence will not suffice.

The trial court did not give the defense of others instruction, indicating that the court "just [did not] see it." While the trial court noted that Mr. Danshin's statements were "evolving and changing[,]" it did not believe that there was any evidence as to an "imminent, immediate threat of death or serious physical harm[]" to Ms. Jones. The trial court believed that Mr. Danshin only ever "described seeing . . . [Mr. Gonzalez-Mena] pulling [Ms. Jones] by the hair and holding her back." The trial court recognized that, according to Mr. Danshin, Mr. Gonzalez "ha[d] a machete[,]" but the trial court believed that there was "no evidence or testimony, even [in] Mr. Danshin's statement [to the police] that [Mr. Gonzalez-Mena was] wielding the machete in some way at [Ms. Jones]." In the court's view, it was "not enough that [Mr. Danshin] kn[e]w[] in the past that [Mr. Gonzalez-Mena] ha[d] threatened [Ms. Jones.]" Thus, the court denied Mr. Danshin's request for the defense of others instruction.

The jury convicted Mr. Danshin on all three counts. The court sentenced Mr. Danshin to life for Count I, 20 years for Count II (consecutive to the sentence for Count I), and 15 years for Count III (concurrent to sentence for Count II).

Mr. Danshin filed a motion for a new trial and request for a hearing based on, among other things, his assertion that the court erred in refusing to give the perfect and imperfect defense of others jury instruction. The court denied that motion.

## 2. The Appellate Court of Maryland

Mr. Danshin timely noted an appeal, and the Appellate Court affirmed his convictions. *Danshin v. State*, No. 918, 2024 WL 4045418 (Md. App. Ct. Sept. 4, 2024). Concerning the issue regarding the defense of others,[9] the Appellate Court rested its holding on the fact that Mr. Danshin denied being the shooter, stating that "Danshin's testimony that he did not shoot [Mr.] Gonzalez-Mena could not be used to support his theory that the shooting was done in defense of [Ms.] Jones." *Id.* at *9–10. Indeed, in the Appellate Court's view, Mr. Danshin "never admit[ted] to shooting [Mr.] Gonzalez-Mena." *Id.* at *9.

The Appellate Court found support for its conclusion from this Court's opinion in *Jarvis v. State*, 487 Md. 548 (2024), noting that, in that case, this Court held that a self-defense instruction could not be generated when all testimony indicated that a stabbing was

---

[9] In the Appellate Court, Mr. Danshin argued that the trial court committed reversible error by failing to ensure that the venire panel would swear to tell the truth before the court conducted *voir dire*. *Danshin*, 2024 WL 4045418, at *1. The Appellate Court found no merit in that allegation of error. *Id.* at *10–12. Although Mr. Danshin sought certiorari review of that issue, this Court limited its review to only the third question presented in Mr. Danshin's petition—the jury-instruction issue.

either accidental or intentional, but not for purposes of self-defense. *Danshin*, 2024 WL 4045418, at \*10 (citing *Jarvis*, 487 Md. at 567). Just as the "evidence proffered did not amount to 'some evidence'" in *Jarvis*, in the instant case, the Appellate Court held that, similarly, Mr. Danshin failed to provide the requisite evidence to support a defense of others instruction when he denied shooting in the first place. *Id.*

### III
### STANDARD OF REVIEW

We recently discussed the applicable standard of review concerning an allegation that the trial court erred in refusing to provide a requested jury instruction:

> At the request of either party, the trial court shall "instruct the jury as to the applicable law and the extent to which the instructions are binding[,]" but the trial court need not "grant a requested instruction if the matter is fairly covered by [other] instructions[.]" Md. Rule 4-325(c). In other words, a requested jury instruction is required when (1) it "is a correct statement of the law;" (2) it "is applicable under the facts of the case;" and (3) its contents were "not fairly covered elsewhere in the jury instruction[s] actually given." *Rainey v. State*, 480 Md. 230, 255 (2022) (quoting *Ware v. State*, 348 Md. 19, 58 (1997)).

> To assign error to a trial court's refusal to give a particular jury instruction, the aggrieved party must lodge an on-the-record objection "promptly after the court instructs the jury, stating distinctly the matter to which the party objects and the grounds of the objection." Md. Rule 4-325(f). On appeal, we review the overall decision of the trial court for an abuse of discretion, but the second requirement (whether the instruction is applicable in that case) is akin to assessing the sufficiency of the evidence, which requires a *de novo* review. *Rainey*, 480 Md. at 255.

*Jarvis*, 487 Md. at 563–64 (alterations in original).

# IV
# ANALYSIS

Given the low bar of the "some evidence" standard, discussed in detail below, we hold that Mr. Danshin met that bar through his statements made to police and introduced as evidence at trial. We do not put forth Mr. Danshin's statements as findings of fact, but merely use them to demonstrate where he overcame the evidentiary hurdle to be entitled to the jury instruction for the defense of others. We review the requested jury instruction, its elements, and the applicable evidence below.

## A.    Jury Instructions and the Law of Defense of Others

Pursuant to Maryland Rule 4-325(c), a circuit court must give a requested jury instruction when three criteria are met: "(1) the requested instruction is a correct statement of the law; (2) the requested instruction is applicable under the facts of the case; and (3) the content of the requested instruction was not fairly covered elsewhere in the jury instruction actually given." *Rainey*, 480 Md. at 255 (quoting *Ware*, 348 Md. at 58). In this case, the parties do not dispute the first or third criterion but disagree on the second. In order for a jury instruction to be applicable under the facts of a particular case, "[t]he requesting party must only produce 'some evidence' to support the requested instruction, and this Court views the facts in the light most favorable to the requesting party." *Id.* (citing *Dykes v. State*, 319 Md. 206, 216–17 (1990)).

We discussed the low bar of the "some evidence" standard in *Dykes*, a case in which we considered whether the appellant should have been granted a self-defense jury instruction:

> *Some evidence* is not strictured by the test of a specific standard. It calls for no more than what it says—"some," as that word is understood in common, everyday usage. It need not rise to the level of "beyond reasonable doubt" or "clear and convincing" or "preponderance." The source of the evidence is immaterial; it may emanate solely from the defendant. It is of no matter that the self-defense claim is overwhelmed by evidence to the contrary. If there is any evidence relied on by the defendant which, if believed, would support his claim that he acted in self-defense, the defendant has met his burden. Then the baton is passed to the State. It must shoulder the burden of proving beyond a reasonable doubt to the satisfaction of the jury that the defendant did not kill in self-defense.

319 Md. at 216–17. And, as we recently noted, there must be "some evidence" "as to each element of [a] defense" for a defendant to be entitled to have the jury so instructed. *Jarvis*, 487 Md. at 564.

In this case, then, we must determine whether there is "some evidence" to support a defense of others jury instruction. This Court has never had the opportunity to discuss the elements for the defense of others jury instruction, having last discussed the defense in *Guerriero v. State*, 213 Md. 545, 549 (1957). In *Guerriero*, this Court recognized that

> [a] third person, closely related to or associated with one attacked in such a manner that he could properly have defended himself by the use of force, has a right to go to the defense of the person attacked and to use the same degree and character of force that the one attacked could have used.

213 Md. at 549.[10] Because the record adequately showed that (1) the defendant's brother "was not in actual or apparent danger of his life or serious bodily harm[;]" (2) the defendant's brother subjectively did not believe he was in danger, so the defendant "could not reasonably have believed that [his brother] was" in danger of death or serious bodily

---

[10] We assumed without deciding (because the State had not contested the point) that a brother satisfied the "closely related to or associated with" requirement. *Guerriero*, 213 Md. at 549.

11

harm; and (3) the defendant's use of force was "excessive under the circumstances[,]" the defendant properly was convicted of assault and carrying a deadly weapon. *Id.* at 547, 549–50. We did not, however, discuss all the elements that must be established by some evidence to successfully generate the defense of others instruction.

Shortly after the creation of the Appellate Court of Maryland in 1966, it applied our iteration of the defense of others from *Guerriero*. *Tipton v. State*, 1 Md. App. 556, 560 (1967). In *Tipton*, the Appellate Court stated that if an initial aggressor is met by a victim with even greater force, then a third party may intervene on the initial aggressor's behalf because the initial aggressor becomes the defender and would legally be entitled to use additional force to defend themself. *Id.* at 562. But, as we illustrate below, the Appellate Court began breaking new ground in the realm of defense of others.

By 1975, the Appellate Court recognized that defense of others contained both a perfect and imperfect component, much like self-defense.[11] *See Shuck v. State*, 29 Md. App. 33, 42–43 (1975), *cert. denied*, 278 Md. 733 (1976). There, the Appellate Court stated:

> Even if the appellant's belief that he had a right to intervene in defense of his companion was erroneous, however, and even granting further the unreasonableness of his excessive escalation to the deadly level of what had been a non-deadly combat, he had nonetheless generated the issue that even this imperfect right of self-defense might mitigate his guilt for the felonious homicide to the manslaughter level and might, thereby, totally exculpate him on the assault with intent to murder charge.

---

[11] While this Court formally adopted the concept of imperfect *self-defense* in 1984, *State v. Faulkner*, 301 Md. 482, 499–500 (1984), we nevertheless noted that the Appellate Court had adopted the concept almost 10 years prior, *id.* at 495–99 (discussing cases from the Appellate Court of Maryland recognizing and applying imperfect self-defense).

12

*Id.* (citation modified). Thus, the Appellate Court vacated the defendant's conviction and reversed the matter for a new trial. *Id.* at 44.

And, by 1982, the Appellate Court eliminated the notion that the intervenor's "protection from criminal charges depends not on what appears to [them] when [they] intervene[], but rather upon the rights of the person who [they] ha[ve] succored," as well as the requirement that the defendee be closely related to or associated with the defender. *Alexander v. State*, 52 Md. App. 171, 174, 177–78, *aff'd*, 294 Md. 600 (1982). In *Alexander*, the defendant was charged with, and convicted of, assaulting a correctional officer when he tried to intervene in what he believed was an overuse of force by the correctional officer on another inmate. *Id.* at 178–79. In his trial testimony, the victim implicitly acknowledged that he was the initial aggressor but noted that Alexander did not witness that initial aggression, and that Alexander would have seen only what would have appeared to Alexander as "violent overreactions" against the victim. *Id.* at 178. The trial court instructed the jury on Alexander's ability to use self-defense, as well as the victim's ability to use self-defense; however, the trial court noted that Alexander's ability to defend the victim existed only to the extent that the victim could have used self-defense. *Id.* at 179. In other words, if the victim "did not have the right to defend himself, then Alexander [did not] have the right to go help [the victim] defend himself." *Id.*

The Appellate Court reversed Alexander's conviction and remanded the matter for a new trial. *Id.* at 185. The court noted that neither Alexander nor the State had addressed what was then Article 27 § 12A, *id.* at 181, which stated:

> Any person witnessing a violent assault upon the person of another may lawfully aid the person being assaulted by assisting in that person's defense. The force exerted upon the attacker or attackers by the person witnessing the assault may be that degree of force which the assaulted person is allowed to assert in defending himself.

Md. Code (1976 Repl. Vol.). In the Appellate Court's view, the trial court erred by "link[ing] Alexander's fate to [the victim's] culpability." *Id.* at 183. Article 27 § 12A's "clear and unambiguous language . . . is that the *witnessing* of the violent assault is that which affords protection for the intervenor." *Id.* at 178. Thus, the "intervenor's right to react is not strictly coterminous with a participant's right to self-defense." *Id.* at 183. On retrial, Alexander was to "be judged on his own conduct[.]" *Id.*[12]

---

[12] As discussed above, the Appellate Court's rationale in *Alexander* hinged entirely on the above-quoted language from Article 27 § 12A. At the time, Article 27 § 12 of the Maryland Code (1971 Repl. Vol.) was the offense of assault with the intent to murder, ravish, or rob, and § 12A provided a safe harbor for third persons wishing to intervene on an assaultee's behalf. Former Article 27 §§ 12–12A-7 were recodified under the new Criminal Law Article ("CR") under the subheading "assault." 2002 Md. Laws, ch. 26. The original Criminal Law Article codified second-degree assault and merely stated that a person may not commit an assault and that one who commits an assault in the second degree is subject to imprisonment not to exceed 10 years, a fine not to exceed $2,500, or both. CR § 3-203 (2002). While the revisor's note to § 3-203 indicates that this was "new language derived without substantive change from former Art. 27, § 12A[,]" the statute made no mention of the safe harbor that was previously codified under Article 27 § 12A. Thus, it appears that, contrary to what the Criminal Law Article indicates, the recodification process did work, at least with respect to assault, a substantive change, as the safe harbor provision in former Article 27 § 12A no longer existed. This was a substantive change because Article 27 § 12A abrogated the common law requirement that defense of others requires a "closely related to or associated with" relationship and hinged entirely on a defendee's ability to use self-defense, as recognized in *Guerriero* and *Tipton*.

Be that as it may, decisions from the Appellate Court that post-date the Criminal Law Article's enactment do not discuss this fact. The Appellate Court did not claw back its holding in *Alexander* after the General Assembly enacted the Criminal Law Article, and, as we discuss above, the Appellate Court continued to reiterate that a successful defense of others does not (1) require a close relationship to or association with the original assaultee or (2) hinge on the original assaultee's ability to defend themself and, instead, was entirely

In 1994, this Court was "asked to decide whether the trial court erred in failing to instruct the jury on the doctrine of 'imperfect' defense of others." *Bowman v. State*, 337 Md. 65, 66 (1994). But we held that, because the defendant had not properly preserved that question for appellate review, the issue was waived. *Id.* at 66–67. We, therefore, had no occasion to address imperfect defense of others, but we noted, in passing, that, at least as of the date of trial in that case, a pattern jury instruction for that defense existed:

> 1: If the defendant actually believed that the person defended was in immediate and imminent danger of death or serious bodily harm, even though a reasonable person would not have so believed, the defendant's actual, though unreasonable, belief is a partial defense of others and results in a verdict of voluntary manslaughter rather than murder.

> 2: If the defendant used greater force than a reasonable person would have used, but the defendant actually believed that the force used was necessary, the defendant's actual, though unreasonable, belief is a partial defense of others and results in a verdict of voluntary manslaughter rather than murder.

*Id.* at 66 n.1 (citation modified). We further noted that "[t]his Court ha[d] not [yet] decided whether Maryland law recognizes the doctrine of 'imperfect' defense of others[,]" and "[b]ecause of [the] disposition [in that] case," did "not [need to] reach th[at] question[.]" *Id.* Roughly three years later, the Appellate Court noted that the pattern jury instruction for perfect defense of others contained four elements:

> (1) the defendant actually believed that the person defended was in immediate *and* imminent danger of bodily harm;

> (2) the defendant's belief was reasonable;

---

dependent on the intervenor's perception of events. *See Lee*, 193 Md. App. at 59 n.9 (noting that *Alexander* did away with the "closely related to or associated with" requirement for defense of others).

(3) the defendant used no more force than was reasonably necessary to defend the person defended in light of the threatened or actual force; and

(4) the defendant's purpose in using force was to aid the person defended.

*Dishman v. State*, 118 Md. App. 360, 377 (1997) (emphasis added). Subsequent cases from the Appellate Court reiterated those requirements. *See Choi v. State*, 134 Md. App. 311, 326 (2000); *Lee*, 193 Md. App. at 56–57; *Robinson v. State*, 209 Md. App. 174, 206 (2012).

As of today, however, there appears to be disagreement on a subtle—yet important—nuance in the pattern jury instruction for defense of others that trial courts use. In this case, the Appellate Court referenced the fact that Mr. Danshin requested the pattern jury instruction for defense of others and quoted that instruction verbatim. *Danshin*, 2024 WL 4045418, at *5 n.5. That quote reveals that, with respect to the first element of defense of others, there need be some evidence as to whether "the defendant actually believed that the person [he] was defending was in immediate *or* imminent danger of death or serious bodily harm[.]" *Id.* (first alteration in original) (emphasis added). This "immediate or imminent" language contradicts the Appellate Court's earlier recitation of the defense's first element, which, as indicated above, required "immediate *and* imminent" death or serious bodily harm. Yet still, other cases from the Appellate Court—more recent than Mr. Danshin's—indicate that the trial court, in providing a perfect defense of others instruction, retained the "immediate *and* imminent" requirement concerning death or serious bodily injury. *Joiner v. State*, No. 1949, 2025 WL 1540485, at *5 (Md. App. Ct. May 30, 2025).

But as the Appellate Court in this case aptly noted, "the parties do not dispute that the requested jury instruction was a correct statement of the law. The question is whether

16

the requested defense of others jury instruction was applicable under the facts of the case."

*Danshin*, 2024 WL 4045418, at *8. Thus, for purposes of this appeal, we assume—because the parties have not argued otherwise—that the trial court's recitation of the elements of defense of others in this case was correct.[13] We consider all four elements below.

**B.      There was "Some Evidence" that Mr. Danshin Acted in Defense of Others**

Mr. Danshin makes several arguments in support of his position that he should have received the defense of others instruction. First, Mr. Danshin contends that a defendant may receive the instruction even when they simultaneously deny being the shooter, i.e., that a defendant may put forth inconsistent defenses, claiming support from our holding in *Sims v. State*, 319 Md. 540, 550 (1990). Second, Mr. Danshin makes the related argument that while he denied being the shooter at times, he explicitly and implicitly admitted to shooting Mr. Gonzalez-Mena at other times, and provided reasons for shooting, meeting the evidentiary requirement of "some evidence" in support of the defense of others jury instruction.

---

[13] While we assume that the trial court's recitation of the defense of others instruction was correct in this case, we intimate no opinion on the actual elements for defense of others should a case properly raise that challenge on appeal in this Court. We frequently employ such assumptions when it is imprudent to otherwise opine on an issue. *See Cromartie v. State*, 490 Md. 297, 310 (2025) (assuming without deciding that the petitioner's "objection encompassed the ground of improper lay witness identification testimony[]"); *Blake v. State*, 485 Md. 265, 306 (2023) ("Given that the same legal standard applies to the prejudice prong when analyzing an ineffective assistance claim under *Strickland* and the materiality standard necessary to establish a *Brady* violation, we assume, without deciding, that the State was required to disclose impeachment evidence prior to the suppression hearing[] . . . ."); *Alarcon-Ozoria v. State*, 477 Md. 75, 100 (2021) ("We assume without deciding that at least some of the jail call recordings between Petitioner and [a third party] satisfied Md. Rule 4-263(d)(1) because the material contained statements of the defendant that referenced the ongoing prosecution.").

Mr. Danshin primarily relies on his police interview introduced at trial to establish "some evidence" as to all four elements for the defense of others jury instruction. First, Mr. Danshin argues that he subjectively believed that Ms. Jones was in imminent danger of death or serious bodily harm when he saw Mr. Gonzalez-Mena pull her by her hair while brandishing a machete. Second, Mr. Danshin's belief was objectively reasonable based on both the circumstances of the event itself and his antecedent knowledge of Ms. Jones's prior abuse at the hands of Mr. Gonzalez-Mena. Mr. Danshin, therefore, contends that a reasonable person in his position could have concluded that Mr. Gonzalez-Mena was going to kill or seriously harm Ms. Jones. Third, Mr. Danshin argues that he used no more force than reasonably necessary to defend Ms. Jones in light of the fact that it looked like Mr. Gonzalez-Mena "was going to cut her . . . head off with the machete." Fourth, Mr. Danshin's purpose in using deadly force was to protect Ms. Jones from imminent danger of death or serious bodily harm, not to punish Mr. Gonzalez-Mena for prior acts.

The State responds that the trial court was correct to deny the jury instruction for defense of others because there was no evidence to show Mr. Danshin's subjective belief at the time of the shooting. The State focuses primarily on the first element of defense of others and argues that, absent some evidence to support the assertion that Mr. Danshin actually believed Ms. Jones was in immediate or imminent danger of death or serious bodily harm, the theory fails, and such a jury instruction is improper.

Specifically, the State argues that Mr. Danshin could not prove that he shot Mr. Gonzalez-Mena to defend Ms. Jones when Mr. Danshin explicitly denied shooting Mr. Gonzalez-Mena. Further, the State posits that Mr. Danshin never stated that he shot Mr.

18

Gonzalez-Mena *because of the fact* that Mr. Gonzalez-Mena was wielding a machete by Ms. Jones's throat. Additionally, the State avers that an individual's state of mind at an earlier time is insufficient to prove their subjective belief at the time of the incident in question. Therefore, according to the State, Mr. Danshin's knowledge of prior abuse cannot support an inference that Mr. Danshin was defending Ms. Jones at the time of the shooting because he believed Ms. Jones was in immediate or imminent danger of death or serious bodily injury. The State further contends that "[Mr.] Danshin never said that he shot [Mr.] Gonzalez-Mena to protect [Ms.] Jones," and concludes that there is no evidence to support any of the elements of a defense of others instruction.

We agree with Mr. Danshin and hold that his police interview testimony introduced at trial contained some evidence to support each element of a defense of others instruction. We analyze each element below.

### 1. There was some evidence that Mr. Danshin subjectively believed that Ms. Jones was in immediate or imminent danger of death or serious bodily harm

Mr. Danshin's police interview provides some evidence of his belief that Ms. Jones was in immediate or imminent danger of death or serious bodily harm at the moment he allegedly shot Mr. Gonzalez-Mena. The State's assertion that there is not "a shred of evidence showing [Mr.] Danshin's state of mind at the critical moment when shots were fired" is inaccurate. While there may be questions about the veracity of his statements (questions that may be resolved only by a trier of fact, not this Court), Mr. Danshin spoke exactly to this point during his police interrogation:

> Mr. Springer: That's the last little piece of the puzzle we're trying to see to get to the why. *Like, why did you shoot [Mr. Gonzalez-Mena]?*

19

Mr. Danshin: *I gave you the why.*

Mr. Springer: Well, I think I have, and I think you were trying to - -

Mr. Danshin: No. *I saw someone in imminent threat of not just bodily harm but imminent threat of lethal bodily harm and with complete knowledge that this person has hurt their victim previously on more than two occasions . . . .*

(Emphases added). Mr. Danshin had already described the "imminent threat of lethal bodily harm" earlier in the interview when he recounted seeing Mr. Gonzalez-Mena, wielding a machete, pull Ms. Jones by her hair back into their room. Mr. Danshin expressed his fear that Mr. Gonzalez-Mena was going to decapitate Ms. Jones. These statements speak directly to Mr. Danshin's state of mind at the time of the alleged shooting and provide some evidence that could potentially lead a trier of fact to conclude that Mr. Danshin subjectively believed that Ms. Jones was in immediate or imminent danger of death or serious bodily harm.

The State argues that this interpretation of events "reorganizes" Mr. Danshin's statements. It undoubtedly draws on multiple parts of Mr. Danshin's police interview, but this does not, as the State seems to imply, stretch the meaning of the statements. Mr. Danshin's interrogation recording was offered in its entirety at trial, and we (and the trier of fact) are permitted—indeed, required—to consider all relevant evidence presented. To be sure, the State's interpretation of Mr. Danshin's interview and the events that unfolded the night Mr. Gonzalez-Mena was murdered are not without merit. But Mr. Danshin's inconsistent statements do not, as the State argues, relying on our opinion in *Jarvis*, 487 Md. at 567–68, amount to "combining individual, out-of-context portions of his statement

20

to cobble together an account different from what he actually said."[14] (Citation modified). Furthermore, the State's interpretation of Mr. Danshin's statements is too narrow and ignores the context in which certain words and phrases ("he," "two guys with machetes," "this," etc.) were uttered, a context which provides a plausible interpretation of events as described above. The fact that Mr. Danshin also repeatedly denied shooting Mr. Gonzalez-Mena does not erase the "some evidence" offered that Mr. Danshin shot Mr. Gonzalez-Mena based on his belief that Ms. Jones was in immediate or imminent danger of death or serious bodily harm.

---

[14] The State—importantly—leaves out key words from our opinion in *Jarvis*. There, the defendant and the victim gave two different accounts of what happened. On the one hand, according to the defendant: (1) the victim was the initial aggressor, (2) the defendant brandished a knife solely to deter the victim from making any further advances, (3) the resulting stabbing that occurred was an accident, and (4) the defendant never, at any point, harbored an intent to stab the victim. *Jarvis*, 487 Md. at 560–61. According to the victim, however, the defendant immediately brandished the knife and, upon the victim learning he had been stabbed and asking the defendant if he had stabbed him, the defendant stated, "Yeah, you mother [expletive], yes." *Id.* at 558–59 (alteration in original). In other words, under the defendant's theory, "the stabbing was not necessary at all." *Id.* at 567. Under the victim's theory, the stabbing "was necessary to carry out [the defendant's] desire to harm [the victim]," not for self-defense. *Id.*

What we refused to do in *Jarvis* was extract from the victim's testimony the confirmation that the defendant intentionally stabbed the victim and combine it with the defendant's testimony to create a third theory of events that otherwise was not independently presented by the evidence: that the stabbing was intentional but for the purpose of self-defense. Thus, we stated that it would not be "appropriate to combine individual, out-of-context portions *of the two accounts* to cobble together an inference that is inconsistent with both of them." *Id.* (emphasis added). No comparable issue occurred here. Mr. Danshin's statements throughout his police interview—although inconsistent—put forth two independent theories, both of which, on their own, are plausible. He does not seek to carve out words or phrases from the statement of any other person to now put forth a defense that he himself did not otherwise maintain throughout his interview. Rather, he simply relies on the words he said to the police.

21

Nor do Mr. Danshin's denials preclude him from pursuing a defense of others theory. As Mr. Danshin correctly notes, this Court held in *Sims* that "a defendant is entitled to have the jury instructed on any theory of defense that is fairly supported by the evidence, even if several theories offered are inconsistent." 319 Md. at 550.

In *Sims*, we considered whether a trial judge erred when he declined to give a voluntary manslaughter jury instruction that included the mitigating defenses of imperfect self-defense and "hot-blooded response to a legally adequate provocation," when the defendant denied being at the scene of the crime. *Id.* at 547–48. We noted that while inconsistent theories are legally permissible, "there will often be practical problems of proof, particularly where different theories involve proof of different mental states on the part of the defendant." *Id.* at 550–51. The appellant in that case ran into such "practical problems of proof," as he testified that he was not at the scene when the shooting occurred, was not upset by the victim's earlier potentially inflammatory comments, and lacked witnesses who could speak to the appellant's appearance at the moment of the shooting. *Id.* at 552–53. We determined that the absence of such evidence truly meant that there was "not a shred of evidence showing the state of mind of the defendant at the moment of the shooting." *Id.* at 553.

In the case at hand, however, Mr. Danshin repeatedly denied shooting Mr. Gonzalez-Mena. Yet, in direct contrast to the appellant in *Sims*, Mr. Danshin also both explicitly and implicitly admitted to shooting Mr. Gonzalez-Mena and provided an explanation regarding his state of mind at the time. Such inconsistencies do not demand that we, or a trier of fact, ignore portions of Mr. Danshin's statements.

22

We said as much in *Roach v. State*, a case in which the petitioner, convicted of first-degree murder, asserted that he was entitled to, and improperly denied, a jury instruction of imperfect self-defense. 358 Md. 418, 421 (2000). The petitioner gave police four separate statements on the night of his arrest, only the third of which contained an admission of guilt, and the assertion that he had been in fear for his life when he shot the decedent. *Id.* at 422. Despite the inconsistencies, we stated:

> [A] reasonable jury could have found that Petitioner had a subjective actual belief that his life was in danger and that he had to react with the force that he did, even though the jury may find that these beliefs were unreasonable. Petitioner's third statement to the police . . . constituted some evidence of self-defense, both of the perfect and imperfect variety, sufficient to generate the issue . . . . Whether the jury would credit that statement, of course, must ultimately be left to the jury alone[.]

*Id.* at 432. Likewise, here, Mr. Danshin provided contrary statements to police, mostly denying being the shooter, but sometimes admitting, explicitly or through inference, that he shot Mr. Gonzalez-Mena. This is sufficient to meet the some-evidence standard.

Finally, we note that *Jarvis* is readily distinguishable from the case at bar. In *Jarvis*, the petitioner was charged with attempted first- and second-degree murder, as well as first-degree assault, when he stabbed his brother-in-law during a physical altercation. 487 Md. at 553. The petitioner requested a perfect and imperfect self-defense instruction, but the trial court gave only the perfect self-defense instruction. *Id.* This Court noted that the individuals involved gave conflicting accounts, but that neither account contained any evidence that the petitioner acted in self-defense, reasonably or otherwise, when he stabbed the victim. *Id.* at 568–69. According to the petitioner, the stabbing was an accident, while according to the victim, "the stabbing was intentional and unprovoked." *Id.* at 567. The

23

petitioner explained that he intentionally tackled the victim, but he consistently maintained that he never intended to *stab* the victim. *Id.* As we noted, "[i]t becomes extremely difficult for a defendant to produce 'some evidence' that he or she subjectively believed using deadly force was necessary to protect themselves, when the defendant testifies that the use of deadly force was accidental only." *Id.* at 569.

However, unlike the consistent testimony in *Jarvis*, Mr. Danshin's statements were varied. He largely denied shooting Mr. Gonzalez-Mena, but he also gave police an admission and a motive. The record, thus, contained at least a "shred of evidence[,]" *Sims*, 319 Md. at 553, for a trier of fact to conclude that Mr. Danshin shot Mr. Gonzalez-Mena because Mr. Danshin subjectively believed that it was necessary to defend Ms. Jones. For the purposes of the defense of others jury instruction, that evidence is not negated by Mr. Danshin's inconsistent statements to the contrary, meeting the low bar of the "some evidence" standard. In the end, Mr. Danshin provided the exact type of evidence that we found present in *Roach* and the exact type of evidence we found missing in *Jarvis*.

## 2. There was some evidence that Mr. Danshin's belief was objectively reasonable

If believed, Mr. Danshin's account of witnessing Mr. Gonzalez-Mena drag Ms. Jones by her hair into the room while holding a machete over her neck could lead a reasonable person to conclude that Ms. Jones was in immediate or imminent danger of death or serious bodily harm. Even if Mr. Gonzalez-Mena did not actually intend to seriously injure or kill Ms. Jones with the machete, as we noted in *State v. Marr* in the context of a self-defense instruction, "the facts or circumstances *must* be taken as perceived

24

by the defendant, even if they were not the true facts or circumstances, *so long as a reasonable person in the defendant's position could also reasonably perceive the facts or circumstances in that way*." 362 Md. 467, 480 (2001). If the perception turns out to be false, that "does not necessarily make it unreasonable[.]" *Id.* at 481.

This analysis does not, however, begin and end with the moments immediately preceding Mr. Danshin's use of force. With some careful boundaries, we can look to prior circumstances; thus, we consider Mr. Danshin's knowledge of the abusive relationship between Ms. Jones and Mr. Gonzalez-Mena, because "[a] belief[] as to . . . imminent danger . . . is necessarily founded upon the defendant's sensory and ideational perception of the situation that he or she confronts, often shaded by knowledge or perceptions of ancillary or antecedent events." *Id.*

We made this same point in *Gunther v. State*, a case in which the petitioner shot and killed his brother-in-law. 228 Md. 404, 407 (1962). We considered whether the petitioner's knowledge that his brother-in-law had a habit of carrying a gun and a history of abuse toward the petitioner's sister was admissible evidence of the decedent's "characteristics of a violent and dangerous person," which a jury could have considered "in determining whether the defendant was apprehensive of danger and in determining who was the aggressor." *Id.* at 408–10. We held that such knowledge was, in fact, admissible and that the lower court should have instructed the jury to consider such evidence when determining the petitioner's state of mind at the time of the shooting. *Id.* at 410.

Such considerations of prior knowledge are not, however, without limitations. As this Court noted in *State v. Martin*, another self-defense case:

25

> Evidence that a defendant may have been afraid of a victim at an earlier time, assuming that is the relevant subjective belief, does not mean that, at the moment of the fatal encounter, that state of mind persisted, especially when, as here, the defendant returned to the site of the encounter after apparently arming himself. Since it is the defendant's subjective belief at the moment that the fatal shot is fired that is relevant and probative, evidence of a prior mental state will not suffice. To justify submitting the issue to the jury, evidence sufficient to support the inference that the relevant state of mind was still in existence at the later time must still be presented.

329 Md. 351, 365 (1993) (footnote omitted). The same concept holds for defense of others. If an individual was afraid for another's safety at the hands of an aggressor in the past, that does not *automatically* mean that same fear persisted in subsequent interactions.

In the case at hand, there is some evidence that Mr. Danshin's prior knowledge of Mr. Gonzalez-Mena's abusive behavior toward Ms. Jones informed Mr. Danshin's fear for Ms. Jones's safety on the night of the incident and, indeed, in the very moments before Mr. Danshin allegedly shot Mr. Gonzalez-Mena.

Ms. Jones texted Mr. Danshin a couple days before the incident, describing physical abuse at the hands of Mr. Gonzalez-Mena, and threats of future violence: "That guy beat the [expletive] out of me[,]" "[t]ook my phone[,]" "[p]inned me down to the [s]eat of the car with his knee on my hair twisting my [breasts,]" "[o]h my God it was so bad[,]" "[h]e pulled up to a dumpster[,]" "[a]nd kept trying to throw me [i]n it[,]" "[s]aid if I left he'd kill me[.]" According to Mr. Danshin, he had that information in mind when he went to the Red Roof Inn on the night of the incident and saw Mr. Gonzalez-Mena with Ms. Jones: "I saw someone in imminent threat of not just bodily harm but imminent threat of lethal bodily harm *and with complete knowledge that this person has hurt their victim previously on more than two occasions*[.]" (Emphasis added). That knowledge, like the petitioner's prior

26

knowledge in *Gunther*, provides some evidence that can support a trier of fact's consideration of whether Mr. Danshin "was apprehensive of danger[.]" *Gunther*, 228 Md. at 410. This, coupled with Mr. Danshin's statement that he saw Mr. Gonzalez-Mena holding a machete above Ms. Jones, dragging her by her hair, provides some evidence that Mr. Danshin's belief that Ms. Jones was in immediate or imminent threat of death or serious bodily harm was objectively reasonable.

**3. There was some evidence that Mr. Danshin used no more force than reasonably necessary in light of the perceived immediate or imminent danger to Ms. Jones**

This Court has historically and repeatedly noted that the force used in self-defense or defense of others may not surpass the use of force, or threatened use of force, to which the defender is responding. *See Guerriero*, 213 Md. at 549 (noting that a defender may "use the same degree and character of force that the one attacked could have used[]"); *Sydnor v. State*, 365 Md. 205, 219 (2001) ("To bring the use of deadly force within the ambit of permissible self-defense, even in resistance of a robbery, burglary, or other assault or felony, there must be a reasonable fear of death or serious bodily injury at the moment the deadly force is used."). Because Mr. Danshin used lethal force, this element is satisfied if there is "some evidence" that Mr. Danshin reasonably believed that Ms. Jones was in immediate or imminent danger of a fatal injury.

As we have consistently noted above, Mr. Danshin was aware that Mr. Gonzalez-Mena had threatened to kill Ms. Jones in the past, and then observed Mr. Gonzalez-Mena manipulating a machete above Ms. Jones in such a way that "it looked like he was going to cut her goddamn head off with the machete." Decapitation is undoubtedly a fatal injury

27

to which gunfire could be considered a commensurate response. Therefore, there is some evidence that Mr. Danshin used the "same degree and character of force" with which he reasonably perceived Ms. Jones was threatened. *See Guerriero*, 213 Md. at 549.

**4. There was some evidence that Mr. Danshin's purpose in using deadly force was to protect Ms. Jones from immediate or imminent danger of death, not to punish Mr. Gonzalez-Mena**

We turn again to Mr. Danshin's statements to police to glean his purpose in using deadly force, and we need look no further than his answer to law enforcement's direct question of why he shot Mr. Gonzalez-Mena. To reiterate:

> Mr. Springer: That's the last little piece of the puzzle we're trying to see to get to the why. *Like, why did you shoot [Mr. Gonzalez-Mena]?*
>
> Mr. Danshin: *I gave you the why.*
>
> Mr. Springer: Well, I think I have, and I think you were trying to - -
>
> Mr. Danshin: No. *I saw someone in imminent threat of not just bodily harm but imminent threat of lethal bodily harm and with complete knowledge that this person has hurt their victim previously on more than two occasions . . . .*

(Emphases added). Mr. Danshin also told police it looked like Mr. Gonzalez-Mena was going to cut Ms. Jones's head off and expressed his belief in protecting vulnerable people and, in particular, Ms. Jones when he said:

> The only people that I would consider hurting are people who hurt women and children. And I think most people would agree that if somebody is going to kill a child, then you do whatever you can to not let that happen. And I understand [Ms. Jones] isn't a child. Maybe she's a little bit older than a child. And certainly not only has there been clear cut examples of what has already happened in that situation, but when you see a machete raised above someone's neck[.]

28

Mr. Danshin's statement can reasonably be read to mean that he felt a duty to protect Ms. Jones when he saw her in danger, not that he allegedly shot Mr. Gonzalez-Mena in retribution for past acts. It would be up to a trier of fact to determine whether such a statement was an accurate reflection of Mr. Danshin's state of mind at the time of the shooting, but it is certainly adequate to establish "some evidence" of this final element for the defense of others.

## V
## CONCLUSION

Through police interview statements, introduced as evidence at trial by the State, the record in this case contained "some evidence" that, if credited by a factfinder, Mr. Danshin acted in lawful defense of Ms. Jones on the night Mr. Gonzalez-Mena was shot. The jury should have had the opportunity to consider whether they believed Mr. Danshin was acting in defense of Ms. Jones, and the trial court, therefore, erred when it declined to give the jury instruction for defense of others. Thus, we reverse the judgment of the Appellate Court and remand with instructions to reverse and remand the case for a new trial.

**JUDGMENT OF THE APPELLATE COURT OF MARYLAND REVERSED; CASE REMANDED TO THAT COURT WITH THE DIRECTION TO REVERSE THE JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY AND REMAND THE CASE FOR A NEW TRIAL. COSTS IN THE APPELLATE COURT OF MARYLAND AND THIS COURT TO BE PAID BY MONTGOMERY COUNTY.**